796 F.2d 821
 SYNDICATE 420 AT LLOYD'S LONDON, Plaintiff-Appellant,
v.
EARLY AMERICAN INSURANCE CO. and World American
Underwriters, Inc., Defendants- Appellants,
v.
E & O UNDERWRITERS OF A.W. KNOTT BECKER SCOTT LTD., et al.,
Defendants- Appellees.
EARLY AMERICAN INSURANCE CO., Plaintiff-Appellant,
v.
SYNDICATE 420 AT LLOYD'S LONDON and World American
Underwriters, Inc., Defendants-Appellants,
v.
E & O UNDERWRITERS OF A.W. KNOTT BECKER SCOTT LTD., et al.,
Defendants- Appellees.
 No. 85-3353.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 13, 1986.
 
 Philip O. Bergeron, Lawrence L. McNamara, Louis C. LaCour, New Orleans, La., for World American.
 Charles M. Steen, William W. Pugh, Margot Mazeau, James H. Roussel, New Orleans, La., for Channel.
 E.F. Barnett, Lake Charles, La., for Early American.
 Alan Dean Weinberger, Robert E. Barkley, Jr., Robert E. Leake, Jr., New Orleans, La., for plaintiff-appellant.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, REAVLEY, and HILL, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 In this appeal, we are asked to review the Herculean efforts of a district judge to slay this Hydra of litigation.[1] Using the sword of a forum non conveniens dismissal, the court below held that this complex series of suits under the Louisiana Direct Action Statute was more appropriately resolved in Great Britain. Using a conditional dismissal, rather than a torch, he attempted to cauterize the wound in order to ensure that the parties dismissed could successfully intervene in an ongoing British lawsuit concerning the same transactions. We have thoroughly reviewed the record and have concluded that, while the labors of the district judge were not in vain, they were not completely successful in ensuring the availability of the alternative forum. Thus, while we affirm the decision of the District Court, we do so only after having modified the conditions imposed on the dismissal.
 
 The Playbill
 
 2
 The cast of characters in this drama is quite large as it indirectly involves at least forty-five separate insurers. There are, however, five principals with whom the reader will become well acquainted as the tale unfolds. The first is Early American Insurance Company (Early American), an Alabama corporation, which issued marine insurance to vessels, principally owned or operated by Louisiana citizens, that plied the inland and coastal waters of Louisiana. Early American is currently undergoing liquidation in bankruptcy proceedings. World American Underwriters (World), the second of the five, is a Delaware corporation that does business in Louisiana. It acted as agent for Early American in placing its insurance and in obtaining reinsurance of Early American's portfolio. The third of the players is A.W. Knott Becker & Scott (KBS). KBS, a British entity, is an insurance broker dealing with underwriters at Lloyd's, London. KBS, like Early American, is undergoing liquidation proceedings.
 
 
 3
 There are two remaining players in this drama. The fourth is Syndicate 420 at Lloyd's London; the fifth is a group known as the Errors and Omissions Insurers of KBS. Syndicate 420 is an underwriting syndicate, an unincorporated association of insurers at Lloyd's that assumes insurance risks. The Errors and Omissions Insurers, however, are less susceptible to cogent description. There are, in fact, two groups of insurers who subscribe to KBS' errors and omissions[2] cover. The first group (the 82-83 Underwriters) subscribed to the professional indemnity policy issued to KBS for the period from April 1, 1982-April 30, 1983. The second group (the 83-84 Underwriters) subscribed to an identical policy for the period of May 1, 1983-April 30, 1984.[3]
 
 
 4
 With that cast of characters in mind, we now turn to set the stage.
 
 Prologue
 
 5
 The circumstances of this tale are intimately intertwined with the tradition, practices, and sometimes curious language of Lloyd's of London. As all know, Lloyd's is not, in reality, an insurance company in either the English or the American sense. It bears little resemblance to a typical corporate insurer. On the underwriting floor at Lloyd's in London are seated a number of underwriters for various syndicates. The syndicates are groups of insurer-investors, represented by the underwriter, that are organized for the purpose of assuming insurance risks. Brokers, such as KBS, approach the underwriter at his desk--in Lloyd's parlance "the box"--and solicit the underwriter's agreement to accept a risk. The broker presents to the underwriter a broker's slip which, under the rules of Lloyd's, must contain all material facts relating to the risk. If the underwriter agrees to accept all, or part, of a risk, he signifies his agreement by signing the slip. The signature, or "scratch," of the underwriter on the slip is the last act necessary for the formation of the insurance contract at Lloyd's.
 
 
 6
 The brokering of risks and the formation of contracts at Lloyd's proceeds rapidly. It affords the underwriter little opportunity to investigate the contours of the risk being brokered. Thus, to minimize their risk, the underwriters usually do not agree to insure entire policies. Rather, there will be a number of syndicates that agree to subscribe to a given cover, each assuming only a specified portion of the total risk.
 
 
 7
 Lloyd's has taken steps to minimize the peril involved in such rapid decision-making. Thus, it imposes upon brokers at Lloyd's a duty of utmost good faith and full disclosure. All facts pertinent and material to the risk must be disclosed when the risk is tendered to the underwriter. The critical nature of this duty, for purposes of this litigation, is that the nondisclosure of material facts in a broker's slip is sufficient--in the eyes of Lloyd's--to render the policies issued on the risk void ab initio.
 
 
 8
 The stage is set, the players have assumed their positions, the curtain rises ...
 
 
 9
 ... And the Tale Unfolds
 
 
 10
 As we stated, Early American issued marine insurance to vessels that plied the waters of Louisiana. That portfolio was partially reinsured by Edinburgh Insurance Company, but in 1982 Edinburgh underwent voluntary liquidation and withdrew from the marine insurance business. Upon being informed of Edinburgh's withdrawal, Early American similarly determined to abandon its marine portfolio. It informed its agent, World, of its decision and requested that World obtain 100% reinsurance of the entire portfolio.
 
 
 11
 World was contacted in June of 1982 by a representative of KBS who proposed to obtain the desired reinsurance for World and Early American. KBS offered to use its resources as an authorized broker at Lloyd's to obtain reinsurance at Lloyd's. World agreed, and shortly thereafter KBS contacted Syndicate 420's underwriter and secured his subscription to a KBS slip, which, subject to specified terms and conditions, authorized KBS to issue a cover note to Early American which cover note would have the effect of allowing World American to reinsure certain risks through Syndicate 420. Instead of issuing the cover note directly, however, KBS issued it to the account of Channel Underwriters. Channel, in turn, issued the cover note to World at World's offices in Metairie, Louisiana.
 
 
 12
 Syndicate 420 now alleges that the KBS slip misrepresented the nature of the Early American risk. Specifically, the Syndicate contends that KBS:
 
 
 13
 (1) Failed to disclose that Early American's portfolio suffered from an adverse loss ratio in the years for which the Syndicate issued its guaranty;
 
 
 14
 (2) Failed to disclose that Early American sought reinsurance of its entire portfolio and planned to retain none of the risk itself; and,
 
 
 15
 (3) Misled Syndicate 420 by stating that its cover note would be issued only for a specific layer of reinsurance on business attaching after July of 1982 when, in fact, the cover note was used by Early American to reinsure its existing portfolio on a primary loss basis.
 
 
 16
 Syndicate 420 contends that these misrepresentations constitute a breach of KBS's duty of utmost good faith and disclosure. It has, therefore, taken steps to vitiate the obligations its underwriter assumed when he signed the KBS slip.
 
 
 17
 The first step taken by Syndicate 420 was to file suit against a number of parties in the Eastern District of Louisiana.[4] The first claim sought a declaration that the Syndicate was not liable to Early American on the policy guarantees contained in the KBS cover note. In the alternative, if the guarantees were found to be valid, Syndicate 420 sought indemnification of its liability from World and Channel.
 
 
 18
 KBS, the broker whose alleged misrepresentations are at the heart of this imbroglio, was not to escape unscathed from the ensuing flurry of litigation. Once having been named as a defendant, World cross-claimed against KBS for indemnity for all losses and damages it sustained in connection with the reinsurance transaction.[5] Early American sought similar relief from KBS and, in addition, filed a cross-claim against World and a counterclaim against Syndicate 420.
 
 
 19
 Thus, what began as a seemingly commonplace reinsurance transaction was transformed into a veritable hydra of litigation--and the hydra was soon to sprout another head.
 
 Enter the E & O Underwriters
 
 20
 KBS, like most insurance brokers, business and professional persons--doctors, engineers, scientists, and indeed lawyers--carried a professional indemnity policy that covered errors and omissions in the course of its brokerage business. Each individual policy separately covered claims made against KBS during the policy years 1982-1983 and 1983-1984. The policies were underwritten by Lloyd's in much the same fashion as were the Early American guarantees; that is, a broker approached an underwriter at a box with a proposal that he assume a share of KBS's errors and omissions risk and the underwriter signed the requisite scratch to the broker's slip. Some 29 separate insurers subscribed to the cover issued to KBS for the 1982-83 policy year; over 40 subscribed to that which covered claims made during the 1983-84 policy year.
 
 
 21
 The relationship between KBS and its insurers was already complex. It became more complicated when the Louisiana Direct Action Statute, La.Rev.Stat.Ann. Sec. 22:655, precipitated the spawning of a new head on this monstrously complex litigation. The Direct Action Statute permits parties injured by the tortious conduct, in Louisiana, of an insured to sue the tort-feasor's insurer directly, without the necessity of an intervening, or post-judgment, action against the insured.[6] Thus, Syndicate 420, Early American, and World--as parties injured by the allegedly tortious conduct of KBS--were afforded an opportunity under Louisiana law to claim against the broker's insurers directly. Predictably, they did so. Just as predictably, KBS's E & O Underwriters moved to dismiss the action.
 
 The Labors Imposed by Eurystheus
 
 22
 Much as Eurystheus imposed the twelve labors upon Hercules,[7] so the E & O Underwriters imposed upon the Court below the Herculean task of resolving a number of exceedingly complex issues in their motions to dismiss. Fifteen of the E & O Underwriters, contending that each lacked minimum contacts with Louisiana, moved to dismiss the direct actions on the grounds that the lower court lacked in personam jurisdiction over them. All of the subscribers to the E & O policies moved to dismiss the actions on the grounds of forum non conveniens, a term of frequent use, itself now imbued with legendary implications.
 
 
 23
 Rather than address a jurisdictional issue that was pertinent to only 15 of the E & O underwriters, the District Court chose to dispose of the forum non conveniens motion first.[8] The E & O underwriters advanced two arguments in support of that motion, each of which the District Judge found persuasive. The first argument was that the scope of the coverage available under the KBS errors and omissions policies was a question governed by English, rather than American, law. Thus, before it could determine the insurers' liability under the Direct Action Statute, the District Court felt that it would first be required to construe the terms of the errors and omissions policies in accordance with English law including, perhaps, the need to do so in light of the customs and practices at Lloyd's. The fact that foreign law would govern that critical issue was considered by the District Court to be a factor that strongly militated in favor of dismissal.
 
 
 24
 The second argument which influenced the District Judge concerned the availability of an adequate alternative forum for the resolution of the dispute. Subsequent to the time they were joined as defendants in the Louisiana direct actions, the E & O Underwriters instituted declaratory proceedings against KBS in the London Commercial Court. The remedy sought by the E & O Underwriters in the London litigation was a declaration that the errors and omissions policies issued to KBS were void by reason of KBS's material nondisclosures in obtaining their coverage. In the alternative, the insurers sought a declaration that the claims made by Syndicate 420, and the other parties to the Louisiana litigation, were not covered by the errors and omissions policies.
 
 
 25
 The critical issue in both London and Louisiana, then, concerned the validity and scope of coverage of the KBS errors and omissions policies. This identity of issues, and the risk of inconsistent judgments if both suits proceeded on parallel tracks, buttressed the E & O Underwriters' argument that London was a more appropriate forum for the resolution of the dispute.
 
 
 26
 The District Court, therefore, dismissed that portion of the Louisiana litigation that was pertinent to KBS's errors and omissions policies on the grounds of forum non conveniens.[9] In order to protect the interests of the parties who remained to litigate in Louisiana, however, the District Court placed four conditions on the dismissal:
 
 
 27
 (1) all of the E & O Underwriters of KBS involved in the Louisiana litigation were required to consent to suit by Syndicate 420, Early American, World and Channel in the English courts or, in the alternative, to agree to actively pursue the suits instituted in London to resolve the errors and omissions coverage dispute;
 
 
 28
 (2) if World, Early American, or Channel desired to intervene in the London litigation, the E & O Underwriters were precluded from contesting their intervention;
 
 
 29
 (3) the E & O Underwriters were also required to waive any jurisdictional defenses and any defenses premised upon the statute of limitations; and,
 
 
 30
 (4) the decision of the English court regarding liability under the errors and omissions policies was to be binding on the E & O Underwriters for all purposes, as was any Louisiana decision regarding the liability of KBS.
 
 
 31
 The E & O Underwriters accepted those four conditions, the District Court dismissed the relevant portion of the Louisiana litigation, and this appeal followed.
 
 The Augean Stables[10]
 
 32
 At the threshold, we are reminded that in resolving a forum non conveniens issue "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." Koster v. Lumbermen's Mut. Casualty Co., 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067, 1076 (1947). The determination of what is convenient turns on a number of public and private interest factors, none of which can be said to be of dispositive weight. Perusahaan Umum Listrik Negara v. M/V TEL AVIV, 711 F.2d 1231, 1237 (5th Cir.1983). The balancing of these factors by the District Court will be reversed only upon a showing of abuse of discretion. "Where the Court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419, 436 (1981).
 
 
 33
 The first step in the analysis of a forum non conveniens dismissal is to determine whether "there exists an adequate and available alternative forum" for resolution of a dispute. Perusahaan, 711 F.2d at 1238. This is so because the doctrine necessarily presupposes the existence of at least two forums in which the defendant is amenable to process. Gilbert, 330 U.S. at 505, 67 S.Ct. at 841, 91 L.Ed. at 1061. Once the Court has determined that an adequate, available forum exists, the next step is to proceed to a balancing of the public and private interest factors, bearing always in mind that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Id. 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. at 1062. Thus, we undertake this two step inquiry and move toward an end to our tale.
 
 
 34
 Diverting the Rivers: The Search for An Alternative Forum
 
 
 35
 The E & O Underwriters contend that an adequate alternative forum for the resolution of this dispute is available in London. Indeed, proceedings are already under way in the London Commercial Court to determine the issue critical to the direct actions in this case--that is, the validity and scope of coverage of KBS's errors and omissions policies. The District Court agreed with the E & O Underwriters and concluded that "it suffice[d] that the defendants, E & O Underwriters are subject to suit abroad .... so long as the United States resident party can bring its claim in a foreign forum and a foreign forum is found to be the more convenient forum, then dismissal is warranted." Record Excerpts at 23.
 
 British Forum Adequate
 
 36
 Early American, World, Channel, and Syndicate 420 all object strenuously to the adequacy determination made by the trial court. In their view, the British forum is inadequate for two reasons. First, they contend that the London Commercial Court is inadequate because it makes available to the E & O Underwriters certain policy defenses that are foreclosed as a matter of law by the Louisiana Direct Action Statute. Second, they assert that the British forum is inadequate because, under English law, they are not proper parties to the proceeding between KBS and its insurers. They contend, therefore, that they lack standing to intervene in the British litigation. These concerns, however well stated they may be, are simply not well-founded.
 
 
 37
 As a matter of public policy, the Louisiana Direct Action Statute prohibits an insurer from asserting against an injured third party certain policy violations of the insured as a defense of liability under the statute. See generally A. Johnston, The Louisiana Direct Action Statute, 43 La.L.Rev. 1455, 1483-90 (1983). A direct action is "subject only to such defenses as the tortfeasor himself may legally interpose." West v. Monroe Bakery, 217 La. 189, 46 So.2d 122, 123 (1950). By definition, an insured could not plead his own breach of contract with his insurer as a defense to a suit by an injured party. Because the tortfeasor is precluded from legally interposing such a defense in a primary action, so his insurer is foreclosed from asserting it in a direct action.
 
 
 38
 In the London litigation, the E & O Underwriters seek to have their coverage of KBS nullified on the grounds that the broker has breached certain of its obligations to them under the errors and omissions policies. Syndicate 420 and the other parties assert that the contractual breaches claimed as a defense to liability in the British litigation would be unavailable as defenses under the Direct Action Statute. They argue, therefore, that the remedy afforded by the British forum is so clearly unsatisfactory as to be no remedy at all. If they were correct in this contention, then under the rationale of Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), the difference in the substantive law governing the action would be a factor afforded substantial weight in the forum non conveniens balance and might tip the scales strongly in favor of maintaining the action in Louisiana.
 
 
 39
 Piper Aircraft held that a difference in the substantive law governing the action "should not be given conclusive or even substantial weight in the forum non conveniens inquiry." In Piper, that meant that the unavailability of strict liability as a theory of recovery was insufficient to render a Scottish forum inadequate for the resolution of a products liability action. 454 U.S. at 247, 102 S.Ct. at 261, 70 L.Ed.2d at 430. The Supreme Court recognized, however, that there will be circumstances in which the remedy afforded by the alternative forum will be so clearly inadequate or unsatisfactory "that dismissal would not be in the interest of justice." Id. 454 U.S. at 254, 102 S.Ct. 265, 70 L.Ed.2d at 435. Those circumstances do not arise unless a party "will be deprived of any remedy or [will be] treated unfairly." Id. 454 U.S. at 255, 102 S.Ct. at 265, 70 L.Ed.2d at 435. In this case, we are persuaded that the difference between the remedies available in Louisiana and those available in London is insufficient to render the British forum inadequate.
 
 
 40
 In the normal course of events, prior to the advent of the direct action, an injured party first filed suit against a tortfeasor, obtained a judgment, and finally made a claim on the insurer. In Louisiana, the Direct Action Statute streamlines that process and, in doing so, eliminates certain defenses that an insurer would ordinarily be able to assert. Although it is true that a direct action may be unavailable in London, and that defenses foreclosed in Louisiana may be available in England, nonetheless we cannot conclude that these differences render the British forum inadequate.
 
 
 41
 Syndicate 420 and the other parties are not precluded from suing the tortfeasor KBS as a result of this dismissal. Indeed, that remedy is still available in the actions exempted from the forum non conveniens dismissal and still pending in the Eastern District of Louisiana. The dismissal entered by the trial court did nothing more than require Syndicate 420 and the other parties to pursue the normal course of events in litigation of this type. The only effect of the dismissal is that Syndicate 420 and the other parties must first sue the tortfeasor KBS in Louisiana and obtain a judgment against it. The E & O Underwriters have agreed to be bound by any decision of that court against KBS. Record Excerpts at 25. Once possessed of that judgment, they can then assert a claim on the E & O Underwriters as KBS's errors and omissions insurers.
 
 
 42
 Viewed in that light, we can no more conclude that the British forum is inadequate than we could had the parties instead been dismissed and told to litigate in Texas. "[T]here is no danger that they will be deprived of any remedy or treated unfairly" in England. Piper, 454 U.S. at 255, 102 S.Ct. at 265, 70 L.Ed.2d at 485. The District Court was, therefore, correct in its conclusion that England was an adequate alternative forum.
 
 British Forum Available
 
 43
 The next question we must resolve is whether, in fact, the British forum is one which is available for the resolution of this dispute. World, Early American, Channel, and Syndicate 420 have all objected to the dismissal on the grounds that the British forum is unavailable to them. They contend that they are not "proper parties" under English law and, therefore, have no standing to intervene in the suit pending in the London Commercial Court.
 
 
 44
 The District Court attempted to avoid this issue by requiring the E & O Underwriters to "waive all jurisdictional and statute of limitation defenses," and obtained a stipulation that they would not oppose joinder or intervention of the Louisiana parties in the proceedings in the Commercial Court in London. Record Excerpts at 25. The defendant's submission to the jurisdiction of an alternative forum renders that forum available for purposes of forum non conveniens analysis. Veba-Chemie A.G. v. M/V GETAFIX, 711 F.2d 1243, 1245 (5th Cir.1983). The imposition of conditions on the dismissal of the E & O Underwriters, therefore, could be seen as having obviated the need to address the jurisdictional concerns raised by Syndicate 420 and the other parties. We believe, however, that this Gordian knot is not so quickly cut.
 
 
 45
 It is unclear on the record before us whether the British courts would decline to allow joinder or intervention as contemplated by the conditions included in the order of dismissal. While under Veba-Chemie a District Court is permitted to assume the availability of the forum on the basis of the parties' waiver of jurisdictional defenses, 711 F.2d at 1245, that working assumption does not account for the possibility that, on the issuance of the forum non conveniens dismissal and with complete compliance with the conditions imposed on that dismissal, the British courts would nonetheless decline to permit the joinder or intervention of the parties other than Syndicate 420, already an intervenor.
 
 
 46
 In order to ensure an available foreign forum, we make explicit the fact that the dismissal is conditioned upon the willingness of the English courts to hear this case as transferred by a sister American court. This additional condition does no more than assure the availability of the alternative forum. See Calavo Growers v. Belgium, 632 F.2d 963, 968 (2d Cir.1980). Thus, the order of dismissal is amended to reflect that the dismissal is conditioned upon the willingness of the English courts to permit the joinder or intervention of Syndicate 420 in the London litigation.[11]
 
 
 47
 Having ascertained that the alternative forum is both available and adequate, we now turn to the task of striking the forum non conveniens balance.
 
 
 48
 Diverting the Rivers: Balancing the Public and Private Interests
 
 
 49
 The second step in our analysis requires that we review the manner in which the District Court struck the forum non conveniens balance. Gilbert teaches that a court is to balance both the private interest of the litigants and the public interests of the forum in determining whether the motion to dismiss will be granted.[12] 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055, 1062. The plaintiff's choice of forum is entitled to great weight in the balancing of factors, and unless the balance strongly favors the defendants, the plaintiff's choice of forum should not be overturned.
 
 
 50
 Much as the Augean stables remained uncleansed for many years, over 30 years elapsed between the Supreme Court's somewhat cryptic decision in Gilbert and its eventual exegesis of the doctrine of forum non conveniens in Piper Aircraft. In Gilbert, the Court stated that "wisely, it has not been attempted to catalog the circumstances which will justify or require either the grant or denial of [the] remedy." 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed.2d at 1062. In Piper, however, the Court enumerated in detail the factors to be considered in resolving a forum non conveniens motion.
 
 
 51
 The private interest factors to be considered by the Court relate primarily to the convenience of the litigants. They include:
 
 
 52
 (1) the relative ease of access to sources of proof;
 
 
 53
 (2) the availability of compulsory process to secure the attendance of witnesses;
 
 
 54
 (3) the cost of attendance for willing witnesses;
 
 
 55
 (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.
 
 
 56
 Piper, 454 U.S. at 241, n. 6, 102 S.Ct. at 258, n. 6, 70 L.Ed.2d at 427, n. 6. The public interest factors relevant to the analysis are:
 
 
 57
 (1) the administrative difficulties flowing from court congestion;
 
 
 58
 (2) the local interest in having localized controversies decided at home;
 
 
 59
 (3) the familiarity of the forum with the law that will govern the case;
 
 
 60
 (4) the avoidance of unnecessary problems of conflict of laws or the application of foreign law.
 
 
 61
 Id. With the rivers that flow through forum non conveniens analysis effectively diverted, we now consider the cleansing effect of these waters on the circumstances of this case.
 
 
 62
 We believe the private interest factors militate strongly in favor of dismissal. The critical issue in the direct actions against the E & O Underwriters concerns the coverage provided by errors and omissions policies that were solicited, negotiated, issued, and delivered in Britain. The coverage was extended by underwriters, nominally British, on behalf of a British insurance broker, KBS, on the underwriting floor at Lloyd's of London. Most, if not all, of the pertinent documentary and other evidence is in England. An understanding of the operating procedures at Lloyd's will be critical to the resolution of the issues. That understanding is most easily obtained from witnesses who are familiar with the unique practices at Lloyd's. Most of those witnesses are British, many may prove unwilling to travel to Louisiana to testify, and an American federal court is without power to compel them to do so. In any event, the cost of obtaining the attendance of even those witnesses who are willing to come to Louisiana to offer their evidence would certainly be considerable, and could prove to be prohibitive.
 
 
 63
 In a nutshell, the practical problems of trying this dispute in Louisiana are such that the proceeding is likely to prove difficult, lengthy, and expensive. Such a result cannot satisfy Piper's instruction that the trial of a case should proceed in the forum where it will prove "easy, expeditious and inexpensive." Piper, 454 U.S. at 241 n. 6, 102 S.Ct. at 258, n. 6, 70 L.Ed.2d at 427, n. 6. Thus, after considering the private interest of the litigants, we have yet to be persuaded that Louisiana is the more convenient forum.
 
 
 64
 Consideration of the public interest factors does little more to persuade us to the propriety of the Louisiana forum. Nearly fifty insurers are implicated in the direct actions and a substantial number of them are foreign domiciliaries and citizens. Fourteen of the E & O Underwriters have filed objections to the in personam jurisdiction of the Eastern District, and the path to the resolution of those issues could prove exceedingly thorny. This litigation has been described as a hydra precisely because its many claims, permutations and parties are reminiscent of that mythical monster. The administrative difficulties it poses if it remains on the docket in the Eastern District are tremendous and do much to persuade us, from a public interest standpoint, that the British forum is more appropriate for the resolution of this dispute.
 
 
 65
 Although there is "a local interest in having local controversies decided at home," Id., this case can hardly be characterized as a local controversy. The primary claims in this litigation arise from the contention of a British insurance syndicate--Syndicate 420--that it should not be liable on reinsurance issued to an Alabama corporation--Early American--and a Delaware corporation--World. These claims gave rise, in turn, to direct actions by those parties against the E & O Underwriters, a group of predominantly foreign insurers. Granted, the underlying risks for which the reinsurance was issued are located in Louisiana, but that fact does not make this case a "local controversy." We simply discern no substantial interest on the part of Louisiana in retention of this litigation in the Eastern District.
 
 
 66
 The final public interest factors concern the law that will govern this action. One of the purposes of a forum non conveniens dismissal is "the avoidance of unnecessary problems of conflict of laws or the application of foreign law." Id. The primary claims in this litigation concern the validity of marine reinsurance guarantees, contracts which are concededly subject to the general maritime law.[13] The same cannot be said, however, of the errors and omissions policies at issue in the direct actions. Those contracts were solicited, issued, and delivered in England to indemnify KBS for errors and omissions committed in the course of its practice as a Lloyd's broker. Not being maritime contracts, the District Court could not rely on the familiar general maritime law to interpret their contractual provisions. Instead, it would be required to interpret them in accordance with the law of the place of contracting; that is, the law of Britain.
 
 
 67
 We are firmly convinced that British law would govern the resolution of the policy issues. The Restatement of Conflicts of Laws instructs us that the relevant factors to be considered in determining the choice of law in a contracts case are:
 
 
 68
 (a) the place of contracting;
 
 
 69
 (b) the place of negotiation of the contract;
 
 
 70
 (c) the place of performance;
 
 
 71
 (d) the location of the subject matter of the contract; and
 
 
 72
 (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.
 
 
 73
 Restatement (Second) of Conflict of Laws, Sec. 188 (1971). Britain has the most significant relationship to the transaction because the policies were solicited, issued, and delivered in that country. The parties to the contract, KBS and its E & O Underwriters, are predominantly British domiciliaries and citizens. It is certainly true that the subject matter of the contract concerned the world-wide errors and omissions liability of KBS, but KBS was a British insurance broker whose offices presumably were located near the underwriting rooms at Lloyd's that provided its life blood.
 
 
 74
 These facts lead clearly to the conclusion that British law will govern the resolution of these issues. The necessity of applying this foreign law, in turn, is simply another factor that militates in favor of the dismissal. And with that ...
 
 
 75
 ... The Curtain Falls
 
 
 76
 Our consideration of the public and private interest leads us to conclude that the hydra has indeed been slain and that the District Court correctly performed its laborious task. The drama has drawn to a close, and the order of dismissal, as modified by us, is affirmed.
 
 
 77
 AFFIRMED.
 
 
 
 [1]
 According to Greek mythology, the Hydra was a serpent that dwelled in the marsh of Lerna, in the Peloponnesus. It had nine heads, each of which, if cut off, was replaced by two heads. One of the twelve great labors imposed upon Hercules by Eurystheus was the slaying of the Lernaean Hydra. Hercules accomplished this task, with the aid of a sword and a torch, by cutting off each head in succession and then cauterizing the resulting wound
 
 
 [2]
 An errors and omissions policy is a form of professional indemnity insurance. It is roughly analogous to a malpractice policy
 
 
 [3]
 The Errors and Omissions Insurers subscribed to these policies at Lloyd's. To avoid confusion, they will be referred to throughout the opinion as "the E & O Underwriters."
 
 
 [4]
 Syndicate 420 instituted this action as a maritime complaint for declaratory relief under F.R.Civ.P. 9(h). In its complaint, it sought to have declared void the reinsurance policies it had issued on the World/Early American marine portfolio. We have previously held that a marine insurance policy is a maritime contract within federal admiralty jurisdiction, Morrison Grain v. Utica Mut. Ins. Co., 632 F.2d 424 (5th Cir.1980), and we can discern no reason why the same would not be true of a marine reinsurance, or similar, policy. Thus, this case is properly within the admiralty jurisdiction of the federal court
 
 
 [5]
 Presumably, this indemnity claim--if successful--would require KBS to indemnify Early American and World in the event they were found liable for indemnification under Syndicate 420's alternative claim
 
 
 [6]
 The Louisiana Direct Action Statute is dealt with extensively by this Court en banc in Crown Zellerbach Corp. v. Ingram Industries, Inc., 783 F.2d 1296 (5th Cir.1986)
 
 
 [7]
 Eurystheus was a Mycenaean king to whose service Hercules was bound. As the legend has it, Hera--the wife of Zeus--so hated Hercules that she prevailed upon Eurystheus to impose twelve great labors upon Hercules. The twelve labors were:
 (1) the killing of the Nemean lion;
 (2) the killing of the Lernaean hydra;
 (3) the capture of the Erymanthian boar;
 (4) the capture of the Cerynean hind;
 (5) the killing of the Stymphalian birds;
 (6) the procuring of the girdle of Hippolyte, Queen of the Amazons;
 (7) the cleaning of the Augean stables;
 (8) the capture of Cretan bull;
 (9) the capture of the mares of Diomedes;
 (10) the recovery of the cattle of Geryon;
 (11) the procuring of the golden apples of Hesperides; and,
 (12) the removal of Cerberus, the guardian of Hades, from the lower world.
 
 
 [8]
 In Gulf Oil v. Gilbert, 330 U.S. 501, 504, 67 S.Ct. 839, 840, 91 L.Ed. 1055, 1060 (1947), the Supreme Court held that "the doctrine of forum non conveniens can never apply in the absence of jurisdiction or mistake of venue." In the normal case, therefore, the District Court must first determine that it possesses both subject matter and in personam jurisdiction before it resolves a forum non conveniens motion. This is so because forum non conveniens is a doctrine which permits a court to decline to exercise jurisdiction already properly vested
 In this case, however, only 15 of 49 E & O Underwriters contested the in personam jurisdiction of the Court. All 49 underwriters, however, are similarly situated with regard to the forum non conveniens inquiry. Thus, we believe this is one of the rare cases in which the District Court properly could proceed to resolve the forum non conveniens issue first, without the need to address the jurisdictional contest. See Calavo Growers v. Belgium, 632 F.2d 963 (2d Cir.1980). Where, as here, the arguments in favor of dismissal are strong, and the jurisdictional objections are inapposite to all but a few parties, the District Court can proceed directly to the resolution of the forum non conveniens issue.
 
 
 [9]
 The dismissal entered applied only to the claims filed against the E & O Underwriters. The primary actions for rescission, indemnity, and damages among Syndicate 420, Early American, World, Channel, and KBS are exempt from the order of dismissal and remain for decision in the Eastern District of Louisiana
 
 
 [10]
 Augeas, the King of Elis, possessed a stable that housed a huge herd of oxen. The stable remained uncleaned for many years, but was finally cleaned in a single day when Hercules diverted through its doors the Alpheus and Peneus rivers. For a modern application of this ancient myth, see Sakraida v. Ag Pro, Inc., 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976)
 
 
 [11]
 The parties are to collaborate in drafting the amended order of dismissal and are to submit it, within twenty one days from the date of this opinion, for formal adoption by this Court. Since Syndicate 420 has already intervened and since E & O Underwriters are seeking the transfer under forum non conveniens and would sustain no additional burden by the imposition of the amended conditions, we assume they have no objection to the proposed amendments. Nor can the Louisiana plaintiffs have any. Nevertheless, if any party objects, it must do so at the time the draft of the proposed order is filed with the Clerk. Until then, the mandate will be held to permit filing of any petitions for rehearing
 
 
 [12]
 Because this case was filed as a maritime complaint, the District Court utilized a specialized forum non conveniens analysis that is normally applied in a maritime context. See Koke v. Phillips Petroleum Co., 730 F.2d 211 (5th Cir.1984). There were, however, a number of non-maritime, ancillary claims at issue in this litigation, and we believe that in resolving those it would have been preferable to apply the "traditional" forum non conveniens analysis delineated in Gilbert and Piper. Thus, for completeness, we follow the traditional course
 
 
 [13]
 See supra note 4