1197

Rodney GRAHAM, d/b/a Cheap Charlie's Fireworks, Respondent v. LLOYD'S OF LONDON, Underwriters of Lloyd's, Lee Pittillo, and Crawford and Company, Defendants, of whom All Those Certain Underwriters Who Do Not Subscribe To Policy # 834/58883/84 are Appellants-Respondents, and of whom All Those Certain Underwriters and International Insurers Subscribing To Policy # 834/58883/84 are Respondents-Appellants.

(371 S. E. (2d) 801)

Court of Appeals

*William E. Lawson* of *McCutcheon, McCutcheon & Baxter,* Conway, *for appellants-respondents.*

*Stanley D. Copeland* of *Batten & Batten, P.A.,* Surfside Beach, *for respondent.*

*Willard D. Hanna, Jr.* and *Dennis H. Smith* of *Joseph, Harris, Hanna & Corbett,* Surfside Beach, and *David M. Leonard,* of *Lord, Bissell & Brook,* Atlanta, Ga., *for respondents-appellants.*

Heard May 18, 1988.

Decided Aug. 1, 1988.

BELL, Judge:

This appeal presents the question: "What's in a name?" Some factual background is necessary to understand the case.[1] In late 1984, Rodney Graham approached an American insurance brokerage named Drayton Insurance Brokers, Inc., seeking coverage for the building and contents of a business known as Cheap Charlie's Fireworks. The building was located in Surfside Beach, South Carolina. Drayton procured coverage through Alexander Howden Limited,

---

[1] The case comes to us on preliminary motions contesting personal jurisdiction. A motion to dismiss for lack of jurisdiction may attack the allegations of the complaint on its face or may be made as a "speaking" motion attacking the existence of jurisdiction in fact. When the issue is the existence of jurisdiction in fact, the court is not confined to the allegations of the complaint, but may resort to affidavits or other evidence to determine its jurisdiction. *Land v. Dollar,* 330 U. S. 731, 67 S. Ct. 1009, 91 L. Ed. 1209 (1947); *Thornhill Publishing Co., Inc. v. General Telephone and Electronics Corp.,* 594 F. (2d) 730 (9th Cir. 1979). Our statement of the facts is drawn from the pleadings and from matter outside the pleadings which the parties introduced in the circuit court.

Lloyd's Brokers, at Lloyd's, London. Cover Notes[2] from Howden to Drayton indicated that the insurance was effected under Policy No. 834/58883/84. The sum insured was US\$ 300,000. The period of insurance was twelve months from 6th November, 1984. The Cover Notes disclosed that 52.0835% of the risk was underwritten by "LLOYDS UNDERWRITERS" and 47.9165% by six named insurance companies. Graham paid a premium of US\$ 12,500, for the insurance.

On October 27, 1985, while the insurance was in effect, Cheap Charlie's Fireworks suffered a fire. Graham filed for the full sum insured, claiming a total loss of the building and contents. The Underwriters advised him that they adjusted the loss at US\$ 185,000, i.e., US\$ 100,000 to replace the building and US\$ 85,000 for the contents. The insurers paid and Graham accepted US\$ 185,000, subject to a reservation of rights by all parties. No agreement was reached on the remainder of the claim.

The dispute between Graham and the insurers turns on whether the building was a total loss within the meaning of the policy. The insurers refuse to pay the full sum insured because the concrete slab upon which the building was erected survived the fire. They maintain the building can be reconstructed on the same slab at a replacement cost substantially less than the full sum insured. As a result of the dispute over the character of the loss, Graham commenced this suit.

In his complaint, Graham names "Lloyds of London" and "Underwriters at Lloyd's" as parties defendant. One Henry Ralph Rokeby-Johnson, an underwriter at Lloyd's, answered the complaint for himself, for those other Underwriters at Lloyd's, London, Subscribing to Insurance Policy No. 834/58883/84, and also for certain insurance companies subscribing to Insurance Policy No. 834/58883/84. He admitted the jurisdiction of the court over himself and the Subscribing Underwriters and Companies. He denied, however, that

---

[2] A cover note is a document prepared by the Lloyd's broker giving the particulars of the insurance he has effected with the underwriters. In the usual course, it is followed by the issuance of a policy of insurance. However, the cover note itself is a binding contract of insurance, whether or not the policy issues. *See Thompson v. Adams*, (1889) 23 Q.B.D. 361.

the court had jurisdiction over any such entities as Lloyd's of London or Underwriters at Lloyd's. He also denied that Graham effected valid service of process upon Lloyd's of London or Underwriters at Lloyd's. The Subscribing Underwriters and Companies filed a motion to correct the parties in the suit.

Another group of Lloyd's Underwriters, styling themselves as "All Those Certain Underwriters Who Do Not Subscribe To Policy # 834/58883/84," filed a motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(5), S.C.R.Civ.P. These Nonsubscribing Underwriters maintain that "Lloyd's of London" and "Underwriters at Lloyd's" are not subject to suit collectively in this case. They also assert that the circuit court has no personal jurisdiction over them and that service of process was ineffectual as to them.

The circuit court denied the motions to dismiss the action and to correct parties. The Nonsubscribing Underwriters and the Subscribing Underwriters and Companies appeal. We affirm.

## I.

Much argument of counsel is consumed with what, exactly, the name "Lloyd's" denotes. The Nonsubscribing Underwriters rely primarily on an affidavit of Lloyd's American general counsel to support their position that Lloyd's is not a legal entity.[3]

According to the affidavit, the underwriters at Lloyd's are a group of natural persons who provide an insurance market for the placement of risks. The individual underwriters belong to more than 400 syndicates. The day to day affairs of each syndicate are conducted by an underwriter who has authority to act for and bind each individual underwriter in the syndicate.

A policy of insurance is procured through a specially designated London insurance broker, known as a "Lloyd's broker," who first obtains the agreement of one syndicate to insure a portion of the risk. On the strength of the agree-

---

[3] A good brief description of how Lloyd's is organized is found in 25 HALSBURY'S LAWS OF ENGLAND, 4th ed., *Insurance*, para. 19 (London 1978). For a detailed modern account see Hodgson, LLOYD'S OF LONDON (New York 1984).

ment with this "lead syndicate," the Lloyd's broker then obtains the agreement of other syndicates to insure the remaining portion of the risk. By the terms of the "Lloyd's Policy" issued to the insured, the members of the subscribing syndicates bind themselves "each for his own part and not one for another" for that portion of the risk to which they individually subscribe.

At times a broker is unable to place 100% of the risk with the underwriters at Lloyd's. When this happens, the broker places the remaining portion of the risk with insurance companies doing business in London.

The Nonsubscribing Underwriters tell us that "Lloyd's" is not an insurance company, as many believe; that it is not a corporation, an association, or a society. They insist that "Lloyd's" is a market, a place where individual underwriters do business. The name "Lloyd's," they contend, is simply a servicemark used by the underwriters at Lloyd's, London; it does not designate a juridical entity.

Graham, on the other hand, tells us that "Lloyd's" most certainly is an association or enterprise engaged in the insurance business. He tells us that "Lloyd's" has members, officers, and a governing committee; that an insurance policy headed "Lloyd's Policy" and sealed with a "Lloyd's" seal was issued to Graham through "Lloyd's Policy Signing Office" by its General Manager; that "Lloyd's" has an American general counsel in New York; that "Lloyd's" maintains bank accounts in its name in this country.

### A.

The name "Lloyd's" has been aptly likened to a period costume—handed down from the world of Sir Christopher Wren, Samuel Pepys, and Edward Lloyd's coffee house—which is donned to conceal the inner workings of an ever changing institution whose members engage in the unsentimental pursuit of profits.[4] The costume cloaks a multitude of activities, including shipping intelligence, insurance brokering, and underwriting. Historically, it has served as a convenient baffle against outside attempts to regulate the

---

[4] Hodgson, *supra*, 45-46. Those interested in the history of Lloyd's may also consult Wright and Fayle, A HISTORY OF LLOYD'S (London 1928).

business of its members. For purposes of this appeal, it is unnecessary to discover every use to which the costume is put. We are concerned with the narrow issue of whether "Lloyd's" is a name under which an insured may sue to enforce a Lloyd's Policy of insurance.

## B.

The Nonsubscribing Underwriters contend they cannot be sued as an unincorporated association, because the Lloyd's policy expressly provides for individual liability only. Although their liability to indemnify Graham may be controlled by the policy—a question to be decided on the merits and not at the jurisdictional stage of the suit—their capacity to be sued is a question of the law of South Carolina. Rule 17(b), S.C.R.Civ.P.

An unincorporated association is a body of individual persons organized without a charter for the prosecution of some common enterprise. *Meinhart v. Contresta*, 194 N.Y.S. 593 (1922). It is not a legal entity separate from the persons who compose it. *Id.; see Medlin v. Ebenezer Methodist Church*, 132 S. C. 498, 129 S. E. 830 (1925). In the eye of the common law, the association itself is an "airy nothing," a "nonexistent legal ghost having no capacity to enjoy legal rights or to suffer legal wrongs." *Venus Lodge No. 62 v. Acme Benevolent Ass'n, Inc.*, 231 N. C. 522, 527, 58 S. E. (2d) 109, 113 (1950); *see also Medlin v. Ebenezer Methodist Church, supra.* For that reason, an unincorporated association cannot be sued in its own name at common law. *See Medlin v. Ebenezer Methodist Church, supra.*

The common law has been modified by statute in South Carolina. Section 15-5-160, Code of Laws of South Carolina, 1976, provides:

All unincorporated associations may be sued and proceeded against under the name and style by which they are usually known without naming the individual members of the association.

The statute does not alter the substantive rule that an unincorporated association has no legal capacity as such. *See Medlin v. Ebenezer Methodist Church, supra.* It does, however, provide a convenient procedure by which a plain-

tiff can bring the members of an association before the court without naming and serving process upon them individually. *Id.*[5] Once they are before the court, the liability of the members of the association, if any, is determined by the applicable substantive law. The statute neither creates nor destroys any substantive liabilities. *Id.*

Simply because the Lloyd's Policy may bind only individual Lloyd's underwriters does not mean that Lloyd's is not an association within the meaning of the statute. In our view, the law was correctly stated in the leading case of *Hoadly v. Purifoy*, 107 Ala. 276, 289, 18 So. 220, 223 (1895):

> Each underwriter is individually liable for a fixed amount, but not for the whole, or for any part of another underwriters [sic] liability, yet all act together to effect the contract of insurance. In the former respect it is an individual undertaking which becomes binding by the separate action of all. In the latter respect, the policy is also the contract of a "company" or "association." It is not a partnership in a legal sense, and in no sense can it be considered a corporation. It is an association or company of individuals, organized to do an insurance business upon certain stipulations and conditions. . . .

The court held, as a matter of law, that a business carried on in the described manner properly falls within the scope of the terms "company," "association," or "individuals." *Id.*

In this case, there can be no doubt the underwriters at Lloyd's are members of a society organized for the purpose of insuring risks. By law, the society is recognized as a legal entity with perpetual succession and a common seal. Lloyd's Act of 1871, 34 Vict., c. 21. The objects of the society include the carrying on by members of the business of insurance of every description. Lloyd's Act of 1911, 1 & 2 Geo. 5, c. 62. These facts alone bring the underwriters within the legal definition of an association. The record before us also shows

---

[5] The practical virtue of allowing suit in the name of the association is well illustrated by this case. Counsel informs us that Graham's policy with Lloyd's was subscribed to by twelve syndicates consisting of over 9,000 individual Lloyd's underwriters.

that "Lloyd's of London" and "Underwriters of Lloyd's" are names by which the members of Lloyd's are usually known. Whatever else it may be, "Lloyd's" is the common name under which a particular group of insurance underwriters conduct their business. Therefore, under Section 15-5-160, Graham may proceed against the underwriters under that name.

## C.

In the alternative, the Nonsubscribing Underwriters argue that even if they are an unincorporated association, Graham's suit should be dismissed because he failed to plead that fact. The complaint designates Lloyd's as "an insurance company or business enterprise engaged in the issuance of policies of insurance." The Insurance Law defines an "insurance company" as including "any ... association, ... society, ... individual, or aggregation of individuals engaging ... as principals in any kind of insurance or surety business. . . ." Section 38-1-20(22), Code of Laws of South Carolina, 1976, as amended (former Section 38-1-20). Under the statutory definition, the underwriters at Lloyd's are an insurance company. *See also Hoadly v. Purifoy, supra.* Applying the rule that pleadings must be construed liberally in favor of the pleader, we hold that Graham's complaint is sufficient to permit proof that "Lloyd's" is an unincorporated association organized for the purpose of permitting its members to carry on the insurance business.

## II.

Having determined that Lloyd's underwriters may be sued under the names "Lloyd's of London" or "Underwriters of Lloyd's," we now turn to the argument that the Nonsubscribing Underwriters should be dismissed from the suit because they were not validly served with process. We first review the applicable law.

Rule 4(d)(3), S.C.R.Civ.P., provides that service shall be made upon an unincorporated association which is subject to suit under a common name by delivering a copy of the summons and complaint to any agent authorized by appointment or by law to receive service of process.

Rule 4(f), S.C.R.Civ.P., provides that all process, other

than a subpoena, may be served beyond the territorial limits of the State, when a statute so provides. Section 36-2-804, Code of Laws of South Carolina, 1976, provides for service outside the State, if the court is authorized under the long arm statute to exercise personal jurisdiction over the person to be served. A "person" includes an association, whether or not a domiciliary of South Carolina and whether or not organized under the laws of South Carolina. Section 36-2-801, Code of Laws of South Carolina, 1976. The long arm statute authorizes the court to exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's contracting to insure any person, property, or risk located within this State at the time of contracting. *See* Section 36-2-803(1)(f), Code of Laws of South Carolina, 1976. The Insurance Law provides that all contracts of insurance on property in South Carolina are considered to be made in the State. Section 38-61-10, Code of Laws of South Carolina, 1976, as amended (former Section 38-9-20).

In this case, the Cover Notes named "Lloyd's Underwriters" and certain insurance companies as the insurers. The Notes appointed Mendes and Mount as agents for service of suit. It is undisputed that Graham caused a copy of the summons and complaint to be delivered to Mendes and Mount, the agent for service designated in the Cover Notes. Under the rules and statutes cited above, this constituted good service on the association.

The Nonsubscribing Underwriters contend they were not validly served, because only those Lloyd's underwriters who subscribed to Graham's policy agreed to appoint Mendes and Mount as their agents for service of process. This contention ignores the terms of the Cover Notes, which named Mendes and Mount as service of suit nominees for "Lloyd's Underwriters." The Cover Notes formed a binding contract of insurance. *Thompson v. Adams*, (1889) 23 Q.B.D. 361. Graham had the right to rely on their provisions, including those related to service of suit. Since neither the Cover Notes nor Graham's policy identified any individual underwriters as the insurers, Graham was free to commence suit on the contract by serving process on Mendes and Mount.

The Nonsubscribing Underwriters also claim Graham

could have examined the insurance policy to determine which syndicates he should have served, instead of attempting to serve the Lloyd's underwriters generally. The facts do not bear out this contention. For reasons undisclosed to us, Graham's policy was not issued until late August 1985, after more than three quarters of the policy period had elapsed. The policy was not delivered to Graham until the loss occurred and his claim had been filed. During argument, counsel informed us that a schedule attached to the policy lists the Lloyd's syndicates insuring Graham, a fact the ordinary person would be hard pressed to discover reading the policy unassisted.

The partially illegible copy of this schedule in the record can best be described as cryptography, unintelligible to anyone but a Lloyd's initiate. It does more to conceal than to reveal the identity of the insurers. The policy nowhere lists the individual underwriters who actually insured the various portions of the risk. In the circumstances, the assertion that Graham knew or could have discovered the identities of the subscribing syndicates or their underwriting members is utterly fantastic. *Schiavone v. Fortune,* 477 U. S. 21, 106 S. Ct. 2379, 91 L. Ed. (2d) 18 (1986), which the Nonsubscribing Underwriters cite in support of their position, is readily distinguishable on its facts.

### III.

It appears the true object of the Lloyd's Underwriters is to obtain a decision that they are liable severally and not jointly by the terms of Graham's policy. The Nonsubscribing Underwriters further seek a decision that they are not liable to cover any part of the risk under the policy. These are questions on the merits which are more appropriately resolved on a motion for summary judgment or a trial on the merits. On a preliminary motion attacking jurisdiction, the plaintiff need only make a prima facie showing that the defendant is subject to the jurisdiction of the court. *See Moorer v. Underwood,* 194 S. C. 73, 9 S. E. (2d) 29 (1940). Moreover, if the attack on jurisdiction requires the court to consider the merits of the case, the court has jurisdiction to proceed to a decision on the merits without dismissing the defendant. *Thornhill Publishing Co., Inc. v. General Telephone and Electronics Corp., supra.*

In affirming the ruling of the court, we decide only the question of personal jurisdiction. We do not reach the questions of who is liable to Graham by the terms of the policy or whether the policy entitles Graham to the full sum insured on the facts of this case. These are matters to be developed by discovery and proved when the merits of the suit are reached.

For the reasons stated, the order of the circuit court is affirmed.

Affirmed.

SHAW and LITTLEJOHN, JJ., concur.

