## BOBE v. LLOYD'S et al.

District Court, S. D. New York. July 21, 1927.

**Insurance ⊜⇒665(1)—Evidence held to show that incorporated society was not suable on insurance binder as treasurer of unincorporated underwriting syndicates (General Associations Law N. Y. § 13).**

Evidence *held* to show that incorporated society, known as Lloyd's, was not suable on insurance binder as treasurer of unincorporated underwriting syndicates, under General Associations Law N. Y. (Consol. Laws, c. 29) § 13.

At Law. Action by Edith Bobe against Lloyd's, a corporation, as treasurer of Lloyd's Underwriters' Syndicates Nos. 670 and 671, and another. Special master's report confirmed, and motion to quash service of summons granted.

Order affirmed 27 F.(2d) 347.

The report of Alfred C. Coxe, Jr., Special Master, here follows:

"This action was commenced in the Supreme Court of the state of New York, December 9, 1924, and was removed to this court on petition of the defendants, appearing specially, on the ground of diversity of citizenship. Thereafter, on application of the defendant Lloyd's, appearing specially, an order to show cause was obtained, directing the plaintiff to show cause why the service of the summons should not be vacated. This motion was heard by Judge Knox, who, following a prior decision of Judge Learned Hand in United States & Cuban Allied Works Engineering Corporation v. Lloyd's (D. C.) 291 F. 889, held that the court had not obtained jurisdiction, and quashed the service. Following this decision, an order was entered on May 15, 1925, directing that 'the service of the said summons and complaint in the above-entitled action by the delivery of the same to the said Harry K. Fowler be, and the same hereby is, quashed and set aside.'

"The plaintiff then carried the case to the Circuit Court of Appeals on writ of error, where the decision of Judge Knox was reversed by a divided court; the majority opinion being written by Judge Manton, and concurred in by Judge Rogers, and a dissenting opinion being written by Judge Learned Hand. The case is reported in 10 F.(2d) 730. The concluding sentences of the prevailing opinion are as follows: 'At this time we pass only upon the pleading, accepting the allegation of facts. At the trial these allegations may not be sustained.'

"The order of the Circuit Court of Appeals contains the following provision: 'Further ordered, that the District Court be authorized and empowered in its discretion to entertain a renewal of the application, and for that purpose to take proofs and determine, if so requested, whether the allegation that Lloyd's, the corporation, acted as treasurer for the individual underwriters, and other allegations upon which the jurisdiction may be dependent, are in conformity with the facts.'

"Thereafter the defendant Lloyd's renewed before the District Court the motion to quash, and asked permission to take proof upon the jurisdictional facts. Upon this motion, the order of reference was made, as above stated, on June 9, 1926.

"The action is brought against 'Lloyd's, a corporation, as treasurer of Lloyd's Underwriters' Syndicate No. 670, and Lloyd's Underwriters' Syndicate No. 671,' and American Agency Association, Inc., for the recovery of $10,000 on an insurance binder, alleged to have been issued September 5, 1924, in favor of the plaintiff, and covering various articles of jewelry.

"The complaint alleges that, in 1924, 11 named individuals, residing in London, Eng-

land, were associated together as an unincorporated association, consisting of more than 7 persons, under the designation of 'Lloyd's Underwriters' Syndicate No. 670,' for the purpose of writing insurance; that 18 other named individuals, also residing in London, England, were associated together as another unincorporated association, consisting of more than seven persons, under the designation of 'Lloyd's Underwriters' Syndicate No. 671' for the purpose of writing insurance; that 'each of said syndicates, and all of them, were and are organized, existing, and doing business as such, at London, England, and the members thereof are citizens of Great Britain'; that 'each of said syndicates had, at all times herein mentioned, as treasurer, and performing the duties and functions of its treasurer in the administration of its funds, receipt and collection of premiums payable on its policies, and the payment of losses incurred thereunder, Lloyd's, a corporation'; that the corporation Lloyd's, in its capacity as treasurer for the two syndicates, Nos. 670 and 671, holds substantial funds in trust for the policy holders of the two syndicates, and that it is the duty and function of the corporation Lloyd's, 'acting in its capacity of treasurer, to administer these funds against losses accruing upon such policies'; that on September 5, 1924, the defendant American Agency Association, Inc., 'assuming to act as agent for and on behalf of defendant Underwriters' Syndicate No. 670 and Underwriters' Syndicate No. 671,' executed and delivered to the plaintiff an insurance binder, under which the two syndicates, No. 670 and No. 671, insured the plaintiff in the sum of $10,000 upon various enumerated articles of jewelry; that on October 1, 1924, the plaintiff tendered the premium of $202.85 to the defendant American Agency Association, Inc., but the tender was refused; that on September 15, 1924, the jewelry alleged to have been covered by the insurance binder was stolen, and that the plaintiff sustained a loss of $10,000.

"The complaint demands judgment 'against defendants, Lloyd's, a corporation, as treasurer of Lloyd's Underwriters' Syndicate No. 670, and of Lloyd's Underwriters' Syndicate No. 671, and/or American Agency Association, Inc., for the sum of ten thousand ($10,000) dollars.'

"The theory of the complaint is that each of the two syndicates, No. 670 and No. 671, is an unincorporated association, and that personal jurisdiction was obtained over each by service of the summons on the corporation Lloyd's, the alleged treasurer, under section 13 of the General Associations Law of the state of New York (Consol. Laws, c. 29).

"This section of the General Associations Law was taken from section 1919 of the old Code of Civil Procedure of the state of New York, and reads as follows:

"'An action or special proceeding may be maintained, against the president or treasurer of such an association, to recover any property, or upon any cause of action, for or upon which the plaintiff may maintain such an action or special proceeding, against all the associates, by reason of their interest or ownership, or claim of ownership therein, either jointly or in common, or their liability therefor, either jointly or severally. Any partnership, or other company of persons, which has a president or treasurer, is deemed an association within the meaning of this section.'

"It is the contention of the plaintiff that the action can be maintained as a suit in personam against the two syndicates as distinct entities, and that, in the event of success on the merits, a personal judgment may be entered, enforceable against the joint property of the respective syndicates. It is not urged in support of the jurisdiction that either of the two syndicates, No. 670 and No. 671, was engaged in business in New York state in 1924 or in 1925. Those facts, it is insisted by the plaintiff, are immaterial under the decision of the Circuit Court of Appeals. It may, however, be stated parenthetically at this time that there is nothing in the record before me to show that either syndicate did business in New York state in 1924 or 1925.

"The questions submitted under the order of reference may be stated generally as follows:

"(1) Were the underwriting syndicates, No. 670 and No. 671, in 1924 and 1925, unincorporated associations within the meaning of section 13 of the General Associations Law of the state of New York?

"(2) Was the corporation Lloyd's acting as treasurer of the two underwriting syndicates in 1924, when the service of the summons was made?

"(3) Did the court obtain jurisdiction by the service of the summons on Mr. Fowler?

"The history of Lloyd's dates back to the latter part of the seventeenth century, when the shipping interests met at a small coffee house kept by Edward Lloyd, at the corner of Abchurch Lane and Lombard street, in the city of London. Originally, Lloyd's was nothing but a place where merchants and

shipping men congregated for the interchange of information and the transaction of mercantile business. But, as time went on, the coffee house developed into a large fraternal organization, with a substantial permanent home, many members, and extensive subsidiary services. Gradually, also, the name 'Lloyds' became synonymous with underwriting by individual underwriters under the supervision and regulation of Lloyd's.

"Lloyd's was incorporated in 1871 by special act of Parliament. Its powers were subsequently enlarged by an amendatory act passed in 1911. Under these acts, Lloyd's became a nonstock corporation, with broad general powers. It is referred to specifically in the acts of 1871 and 1911 as the 'society.' It was not organized for profit, and does not do an insurance business. Whatever earnings it is able to make are used to enlarge its facilities, or extend its services. The act of 1871 provides that the governing body shall consist of a committee of 12, elected by the members, 3 members of the committee retiring each year. There is also, in this act, a schedule prescribing the 'Fundamental Rules of the Society.' These rules divide the members into 'underwriting members' and 'nonunderwriting members,' and provide that nonunderwriting members shall not do any underwriting business at Lloyd's. It is further provided in the act that any member shall cease to be a member if convicted of an infamous crime, or if convicted of having committed a fraud, or if he has become bankrupt, or insolvent, or suspends payment, or places his affairs in the hands of trustees, or makes or proposes any composition with creditors, or if he is in arrears for one year in respect to any subscription, or any sum payable by him under the by-laws.

"Under the by-laws, any person desiring to become a member must be recommended by six members, and be elected by a majority of the committee. There is an entrance fee and annual dues. The administrative functions of the corporation are lodged in the committee, which annually selects from its own members a chairman and a deputy chairman. The committee also appoints all subcommittees and executive officers. It has general supervision of the affairs of the corporation.

"Before being allowed to engage in nonmarine underwriting at Lloyd's, members are required to execute various trust documents and make certain deposits, in order to protect their underwriting engagements, as follows: (1) A statutory premium trust deed

(Lloyd's Exhibits 1–a–S, 2–a–E). (2) A nonstatutory trust deed (Plaintiff's Exhibit 5). (3) An assignment of premiums (Plaintiff's Exhibit 6). (4) A guaranty agreement (Plaintiff's Exhibit 8).

"These documents were executed by each of the individuals composing syndicates 670 and 671, and it is upon them that the plaintiff places her main reliance in support of her contention that the corporation Lloyd's was acting as treasurer of the two syndicates in 1924.

"The Statutory Premium Trust Deed. .

"This is an instrument required from each nonmarine underwriter under the Assurance Act of 1909, and is in the form prescribed by the Board of Trade, a department of the government. The parties to the deed are the individual underwriter, described as the 'name', a designated individual, who is also the syndicate agent, designated as the 'agent,' and the corporation Lloyd's. The deed is in effect nothing more than a declaration of trust by the individual underwriter that all premiums received by the agent on account of underwriting by the individual underwriter at Lloyd's, shall be available in the hands of trustees for the payment of losses and claims of the named underwriter. In paragraph 3 it is provided that all investments of the trust fund shall be held in the names of not less than two trustees, one of whom shall be the agent. Paragraph 8 provides that no policy holder or person having a claim against the underwriter shall have any right to interfere in the administration of the trust.

"Under this instrument, the trustees may appropriate the premium income to the payment of policy claims against the underwriter in preference to other general indebtedness of the individual underwriter. The corporation Lloyd's is not one of the trustees, and is joined as a party in order to give it standing to enforce the agreement.

"The Nonstatutory Trust Deed.

"This trust deed is executed by each underwriting member, and is accompanied by a deposit in cash or securities, or both. The corporation Lloyd's is the sole trustee named in the instrument, and the cash and securities are deposited with it by the depositing member. The deed, after reciting that the, depositor is desirous of being admitted as an underwriting member of Lloyd's, declares that Lloyd's shall hold the deposited fund as a trust fund to be made available by Lloyd's in the event that the underwriter shall default

on his obligations incurred in the business transacted by him at Lloyd's. It is provided in the deed that until the committee of Lloyd's has received notice in writing that the underwriting member has made default upon his policy obligations, and until the committee has passed a resolution declaring such default the trustees shall pay the annual income of the trust fund to the depositing member. It is also provided that, if the depositing member shall make default in paying his policy obligations, 'of which default having been made a resolution of the committee to that effect shall be sufficient evidence,' then the committee shall liquidate the fund, and apply the proceeds to the payment of claims upon the policies underwritten by the depositing member. Mr. MacKinnon, former chairman of Lloyd's, testified that a default would not be declared by the committee of Lloyd's except in the event of the insolvency of the depositing underwriter.

### "Assignment of Premiums.

"This is a formal document executed by every underwriting member at the time of his admission to membership, assigning to the corporation Lloyd's all premiums on policies underwritten by him at Lloyd's, in trust, for the purpose of protecting his underwriting engagements. It is a companion piece to the deposit trust deed (Plaintiff's Exhibit 5), and is required for a similar purpose. Mr. MacKinnon testified that the assignment was necessary in order to satisfy the British Recording Acts. The instrument contains a clause making it in effect operative only in case the underwriting member shall default in his engagements at Lloyd's, and the committee of Lloyd's shall, by resolution, so declare.

### "Guarantee Agreement—Plaintiff's Exhibit 8.

"Every nonmarine underwriter at Lloyd's is required to make a deposit equal to the amount of his premium income. This deposit can be made in cash or in securities, or in cash and securities, but the minimum deposit required is £2,000. Beyond the stated minimum £2,000, the underwriter is permitted to furnish a guarantee agreement, signed by other underwriting members, guaranteeing the performance of his engagements at Lloyd's. The corporation Lloyd's is named as a trustee in this agreement. The agreement, by its terms, is to be operative only in case a guaranteed member shall make default in his obligations at Lloyd's, and the other funds, held in trust for him, shall be insufficient to meet his liabilities. In that event, the guarantors may be called upon to make good the deficiency pro rata. The agreement is a substitute for the deposit of cash and securities beyond the minimum of £2,000, and is to be read in connection with the deposit deed, Exhibit 5.

### "The General Guaranty Fund.

"There was some testimony to the effect that prior to 1924 there was in the hands of the corporation Lloyd's a general guaranty fund, which had been contributed voluntarily, in some way, by the underwriting members in preceding years, to be used by the committee of Lloyd's in its sole discretion for the purpose of meeting unexpected losses. It was, however, stated by Mr. MacKinnon that this general guaranty fund had been abandoned prior to 1924.

### "Method of Transacting Business at Lloyd's.

"There are two general classifications of underwriting at Lloyd's, marine and nonmarine. The marine business is the older form, and is not subject to statutory control. The nonmarine underwriting is, however, a comparatively recent development, and is subject to the supervision of the Assurance Companies Act of 1909.

"The underwriting business at Lloyd's is transacted by the underwriting members acting in groups or syndicates. These syndicates are organized by the members themselves and vary greatly in size and composition, as shown by syndicates 670 and 671, one composed of 11 members, and the other of 18 members. Each syndicate operates through a salaried agent, who is designated in a formal document executed by each individual underwriter belonging to the syndicate (Lloyd's Exhibits 7 and 8). The syndicate agent is the active manager of the syndicate. He keeps the syndicate books, passes on all business offered, accepts or rejects risks, collects premiums, pays losses, and disburses all funds.

"Under the usual method of transacting business at Lloyd's, the London insurance broker prepares a 'slip,' giving the details of the insurance required, goes to the agent for the syndicate, and offers him the risk. There is keen competition for the business as between the different syndicates, and if the risk is acceptable to the agent of a particular syndicate, he initials the 'slip,' and returns it to the broker, who then issues a certificate stating that the insurance has been effected. Later a policy is prepared, initialed by the

agent, and signed in the names of the individual underwriters comprising the syndicate which has accepted the risk. The physical act of signing the names of the individual underwriters to the policy of insurance is performed by the 'Signing Bureau,' a clerical bureau of Lloyd's, and expressly authorized by the individual underwriters to affix their respective signatures.

"Premiums on the insurance are collected by the agent from the brokers and are held by the agent pending the annual audit of the accounts. This annual audit is required by the Assurance Companies' Act of 1909, and is conducted by an accountant selected by the underwriter, or the syndicate agent, from a list of accountants, approved by the committee of Lloyd's. After making the audit, the accountant prepares in duplicate an audit certificate (Lloyd's Exhibit 3–a and 3–b), one of which is filed with the Board of Trade and the other with the committee of Lloyd's. This audit certificate shows the premium income of each individual underwriter, and certifies that 'the assets shown in the books and those deposited with Lloyd's committee and those since provided, belonging to each name, are correctly valued and available, and sufficient to meet his liabilities as therein shown, and to wind up his outstanding underwriting accounts.'

"In practice, the underwriter is left unmolested by the committee of Lloyd's as long as he is able to pass the audit; but, if the audit shows his accounts are impaired, he is required by the committee of Lloyd's to make up the shortage, or cease doing business.

## " 'The Story of Lloyd's.'

"There was introduced in evidence before me, a pamphlet called 'The Story of Lloyds' (Plaintiff's Exhibit 7), which, concededly, was printed and issued by the corporation Lloyd's. It is stated in the pamphet itself that it was based on a popular lecture delivered by a former chairman of Lloyd's in 1921. The pamphlet contains a number of general statements regarding the liability of Lloyd's underwriters, and the nature of the trust funds and deposits required of underwriting members, which are in many respects inaccccurate and erroneous. I do not feel, though, that there is anything in the pamphlet to change the inherent character of the insurance underwritten at Lloyd's, or to alter the facts with respect to the trust deeds and deposit agreements already discussed. The pamphlet was severely criticized in England, and was finally withdrawn.

## "Lloyd's New York Office.

"In 1924 and 1925, the corporation Lloyd's maintained in New York. City an office, which was in the general charge of Mr. Harry K. Fowler, a salaried agent of Lloyd's. It was a small office, devoted principally to the work of gathering and disseminating shipping information and statistics. The agency occupied much the same position as the many other Lloyd agencies in different parts of the world. In addition to having general charge of the office, the agent, Mr. Fowler, acted frequently as a surveyor in cases of marine disaster or damage to merchandise, and issued certificates of damage therefor. For these services, he received fees, which were accounted for to the corporation Lloyd's. It was stated that, in the other agencies of Lloyd's, where the office of agent was not a salaried office, the fees collected were retained by the agent. In the case of the New York agency, the fee collections were turned over to the corporation, inasmuch as the agent was a salaried agent, being one of the two salaried agents maintained by Lloyd's.

## "Facts Relating To Plaintiff's Claim.

"In September, 1924, the plaintiff applied to the defendant American Agency Association, Inc. (hereinafter called 'Association'), a New Jersey corporation engaged in the insurance brokerage business in Jersey City, N. J., for jewelry insurance on her personal jewelry. Following this request, the Association cabled Robert Gardiner Mountain & Co., Limited, insurance brokers in London, England, requesting them to place the insurance at Lloyd's in the sum of $10,-000. There was not at the time any authority in the Association to represent the London brokers or any underwriters at Lloyd's; the Association acting only for the plaintiff, in an effort to place the insurance through the London brokers with Lloyd's underwriters. The cable from the Association was received by the London brokers September 6, 1924, and they thereupon made out a 'slip,' giving the details of the insurance requested, and submitted the slip to Walter Adam Scott, the agent for the two syndicates, Nos. 670 and 671, who approved the risk for the individual members of both syndicates, subject to the submission of a satisfactory proposal form. The London brokers thereupon advised the Association that the insurance had been placed. In the meantime, and on September 5, 1924, the Association had notified the plain-

tiff that the insurance had been placed from September 5, 1924, to September 5, 1925, 'subject to proposal form,' and 'subject to underwriters' acceptance.' On the same date the Association billed the plaintiff for the premium amounting to $202.85. Subsequently Mr. Scott, the agent for syndicates Nos. 670 and 671, declined to accept the risk and sign the policies on behalf of the underwriters whom he represented, 'on the ground that the necessary conditions had not been complied with.'

"It is alleged in the complaint that the plaintiff's jewelry was stolen 'on or about September 15, 1924,' and that the plaintiff tendered the sum of $202.85 to the Association October 1, 1924, but that the tender was refused. The premium was never received by the London brokers or by Mr. Scott, the agent of the two syndicates, Nos. 670 and 671.

"Syndicates No. 670 and No. 671.

"In the certificate issued to the plaintiff by the defendant American Agency Association, Inc., dated September 5, 1925 (Plaintiff's Exhibit 1), the insurance stated to have been placed was described as 'Lloyd's all risks jewelry floater—form R (a).' This is substantially the description of the insurance in the 'slip' submitted to Mr. Scott, the agent of the two syndicates (Lloyd's Exhibit 10). The division of the risk between the two syndicates is stated in the 'slip' as $4,000 assumed by syndicate No. 670, and $6,000 assumed by syndicate No. 671. There were 11 underwriting members in syndicate No. 670, and 18 underwriting members in syndicate No. 671.

"If, then, following the approval of the 'slip' by Mr. Scott, the agent of the two syndicates, an insurance policy had been prepared and signed, in the form specified in the certificate issued to the plaintiff, and mentioned in the 'slip,' this policy would have contained the signatures of 11 individual underwriters comprising syndicate 670, and 18 individual underwriters comprising syndicate 671, and the amount for which each individual underwriter would have been individually obligated would have been a fractional part of the amount assumed by the syndicate of which he was a member. This liability was several, not joint, and each underwriter was obligated only for the amount of his individual underwriting, irrespective of the obligation of any of the other underwriters.

"I am of the opinion, and so report, that Underwriting Syndicates Nos. 670 and 671 were not, in 1924 and 1925, unincorporated associations, within the meaning of section 13 of the General Associations Law of the state of New York.

"This section was taken from section 1919 of the old Code of Civil Procedure of the state of New York, and it has been uniformly held, in the construction of that section, that, in order to maintain an action against an officer of an unincorporated association, the cause of action must be one which the plaintiff can maintain against all of the members of the association, either jointly or severally. McCabe v. Goodfellow, 133 N. Y. 89, 92, 30 N. E. 728, 17 L. R. A. 204; Schouten v. Alpine, 215 N. Y. 225, 109 N. E. 244; People ex rel. Solomon v. Brotherhood, 218 N. Y. 115, 112 N. E. 752.

"In McCabe v. Goodfellow, supra, Judge Maynard, writing for a unanimous court, stated at pages 92 and 93 of the opinion (30 N. E. 729): 'But the plaintiff cannot, in any case, maintain such an action against the officer, unless the debt, which he seeks to recover, is one upon which he could maintain an action against all the associates by reason of their liability therefor, either jointly or severally. This, therefore, is the test to be applied in the present case. The plaintiff must allege and prove, and the court must find, that all the members of the association were liable, either jointly or severally, to pay the plaintiff the amount of his claim, or the judgment in this action cannot stand.'

"There is no joint or several liability in the present case. The obligation of each underwriter is only for a fractional part of the whole amount assumed by the two syndicates, and a joint judgment against the 29 individuals comprising the two syndicates would, therefore, be improper.

"The cases of New York Board v. Whipple, 36 App. Div. 49, 55 N. Y. S. 188, and Imperial Co. v. Jewett et al., 169 N. Y. 143, 62 N. E. 167, have no bearing on the present case. In the Whipple Case, the decision was placed squarely on the ground of a statutory liability, obligating the syndicate members jointly, whereas, in the present case, the whole basis of the claim is that there was a contract of insurance with underwriters at Lloyd's comprising syndicates 670 and 671. The Jewett Case turned on a question of estoppel, and a recovery was permitted because the agents had been held out to the plaintiff as having authority to write insurance. There is no similarity between that

case and the present case. Here, the 'covering note' issued by the American Agency Association, Inc., refers specifically to the insurance as a Lloyd's policy of standard form, and the legal effect of such a policy was well known and understood. Furthermore, there was no holding out of the agency by the two syndicates, and nothing upon which an estoppel might operate.

"I am of the opinion and so report, that the corporation Lloyd's was not acting as treasurer of the two underwriting syndicates 670 and 671 in 1925, when the service of the summons was made.

"The treasurer of an unincorporated association can only be a person to whom executive authority and responsibility has been delegated by the members of the association collectively. It is immaterial what name is given to the official holding the office, as long as the duties are such as ordinarily attach to the office of a financial representative. The corporation Lloyd's did not act in any way as a treasurer of syndicates 670 and 671. It had no authority to represent, or to speak for, either of these two groups of individuals; neither did it have authority to act in the capacity of a financial representative of the individuals composing the two syndicates. In certain contingencies, it might, under its powers of supervision over its own members, enforce obedience to its orders; but this in no way made it a treasurer of the syndicates themselves. According to the testimony produced before me, the treasurer of syndicates 670 and 671 was the duly constituted agent, who, in the case of syndicate 670 was G. U. Price & Co., Limited, or Walter Adam Scott, and, in the case of syndicate 671, was Walter Adam Scott.

"I find nothing in the trust deeds and assignments already described (Lloyd's Exhibits 1-a-S, 2-a-E, Plaintiff's Exhibits 5, 6, 8) in any way to alter the essential character of the relation existing between the corporation Lloyd's and the individual underwriters comprising the two syndicates. These instruments were separately executed by the individual members of the two syndicates, and the trusts created by them were separate trusts, available only in favor of the depositing underwriter. Furthermore, these deposits were, in each case, specifically stated to be in trust, and not capable of being reached by execution or attachment. They were not general deposits applicable to the syndicate operations of the two underwriting syndicates, but special trusts, which might be utilized by the committee of Lloyd's to protect the individual obligations of the depositing underwriter in case of default or of insolvency. These trust funds were such as experience and sound business had shown to be necessary to protect the policy holders of the individual underwriters and preserve the integrity of Lloyd's.

"In conclusion, I am of the opinion, and so report, that the court did not obtain jurisdiction by the service of the summons on Mr. Fowler.

"The business transacted by the corporation Lloyd's, in New York state, was concededly not an insurance or underwriting business. Mr. Fowler, the agent in charge of the New York office, was in no way connected with either of the two syndicates 670 and 671, and did not have any authority to act for, or represent, either of them. Neither syndicate 670 nor syndicate 671 did any business in New York in 1924 or 1925.

"I am clear, therefore, that by the delivery of the summons to Mr. Fowler, on December 9, 1924, the plaintiff did not obtain jurisdiction either of 'Lloyd's Underwriters' Syndicate No. 670,' or of 'Lloyd's Underwriters' Syndicate No. 671.'"

William Otis Badger, of New York City (Alfred L. Pitts, of Brooklyn, N. Y., on the brief), for plaintiff.

Barry, Wainwright, Thacher & Symmers, of New York City (Herbert Barry and James K. Symmers, both of New York City, of counsel), for defendant Lloyd's.

THACHER, District Judge. The sole basis for jurisdiction is found, if found anywhere, in section 13 of the General Associations Law of this state, and to sustain jurisdiction under that section plaintiff is required to show, as she has alleged, that within the meaning of the statute the incorporated society known as "Lloyd's" was the "treasurer" of the underwriting syndicates named in the complaint when the summons in this action was served in New York upon its agent, Harry K. Fowler.

In reversing the decision of this court quashing the service of the summons herein, the Circuit Court of Appeals accepted as true the allegation of the complaint that the incorporated society of "Lloyd's" was, at the time of such service, the treasurer of the unincorporated syndicates referred to in the complaint, and authorized a renewal of the motion to quash and a consideration of proofs to determine whether this allegation

and the other allegations of the complaint upon which jurisdiction depended were in conformity with the facts. A reference for this purpose was ordered, upon which the special master has determined that the jurisdictional allegations alleged in the complaint, or some of them, are not well founded in fact.

The relationship between the society and its underwriting members is fully disclosed by the evidence, and quite clearly defined by the documentary proofs, and it is quite certain, I think, that no basis of fact can be found here for the contention that the society acted as treasurer for the unincorporated syndicates referred to in the complaint. The situation is fully discussed in the careful report of the master, and it is only necessary to add that I concur in his conclusion that the incorporated society known as "Lloyd's" was not suable as the treasurer of the underwriting syndicates referred to in the complaint, under section 13 of the General Associations Law of this state.

The special master's report is confirmed, the motion to quash is granted, and the fees of the special master are fixed at $750, to be taxed as costs.