John S. ROBY, et al., Plaintiffs,

v.

The CORPORATION OF LLOYD'S a/k/a the Society and Council of Lloyd's d/b/a Lloyd's of London, et al., Defendants.

91 Civ. 7081(MEL).

United States District Court,
S.D. New York.

June 12, 1992.

Proskauer Rose Goetz & Mendelsohn (Dale A. Schreiber, Minna Schrag, Steven B. Feigenbaum, Bruce E. Loren, of counsel), New York City, for plaintiffs.

Cahill Gordon & Reindel (Charles A. Gilman, Robert A. Alessi, Adam Liptak, of counsel), New York City, for "Syndicate defendants".

LASKER, District Judge.

This action alleges violations of the federal securities laws and RICO [1] against various entities which are part of the enterprise known as Lloyd's of London. The 91 investor-plaintiffs allege that solicitation of investor/underwriters in the United States by Lloyd's agents constitutes "sale of securities" and that Lloyd's syndicates are "issuers" within the meaning of the securities laws. They assert that they were deceived as to, *inter alia*, the types of risks assumed by, and the experience of the underwriters of, the syndicates in which they invested. The syndicates are groups of

---

1. The RICO counts are predicated exclusively on the alleged securities violations.

insurer-investors which are organized for the purpose of assuming insurance risks.

The Syndicate Defendants move to dismiss the action as to them pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Fed.R.Civ. P., on the ground that they are not legal entities capable of being sued. The dispositive question is whether a syndicate exists as a separate legal entity apart from the investors in the syndicates (who are generally known as Names); or whether, as the syndicates claim, they are merely "groupings" of individual Lloyd's underwriters who severally undertake insurance obligations.

The syndicates contend that the law of England controls the question of their legal existence—England being the syndicates' home jurisdiction and the forum designated under plaintiffs' various agreements with the Lloyd's community—, or failing that, that the law of New York, the situs of this action, controls. The plaintiffs submit that federal law, in particular the Securities Act of 1933 and the Securities and Exchange Act of 1934 in combination with Fed. R.Civ.P. 17(b), controls.

The syndicates' motion is granted.

## I.

Lloyd's of London is a venerable institution, dating back to the latter part of the seventeenth century, long known for its insurance business. Although Lloyd's is generally considered to be a unitary organization, it actually is not, and in fact bears little resemblance to the typical corporate insurer. It issues no insurance policies. Rather, it acts as a market for the buying and selling of insurance risks.

According to the syndicates, the closest American analogue to Lloyd's is the New York Stock Exchange. Lloyd's provides the premises, administrative staff and support services for the market; it also issues rules and regulations and monitors transactions that occur in the market. Like the New York Stock Exchange, Lloyd's does not participate in individual decisions made by its brokers, members or underwriters.

The persons who carry on the business at Lloyd's are, respectively, the brokers, active underwriters, member's agents, managing agents, and Names (who make up the syndicates). The Names are the individual investors. They pay fees and delegate complete authority to conduct Lloyd's affairs to "member's agents." Although Names are the ultimate underwriters of the insurance, they do not participate actively in the underwriting process or in the recruiting of other Names to the syndicates. They have no management authority and cannot bind their fellow members or the syndicate. Membership in a Lloyd's syndicate is personal and not transferable and terminates upon the death of the member.

Member's agents recruit new Names and handle the admission of Names to Lloyd's membership. Member's agents are ordinarily also chosen to act as Names' underwriting agents [2] and, in that role, are responsible for placing Names in syndicates. In connection with the latter, the member's agent contracts with a "managing agent" to place the member in a group comprised of two to several hundred other Names. These groups constitute the syndicates. Managing agents run the syndicates. They hire the syndicate's active underwriter and maintain the syndicates' accounts and other records, among other things.

An employee of the managing agent, known as the "active underwriter," acts on behalf of the Names in a syndicate in the "buying" and "selling" of insurance risks. Active underwriters are seated on the underwriting floor at Lloyd's in London. Brokers approach the active underwriter at his desk—in Lloyd's parlance "the box"— to solicit the underwriter's agreement to accept a risk. The active underwriter decides which of the risks, offered to him by brokers, to accept and at what premium, and negotiates the conditions of coverage and the proportion of risk his syndicate will

---

**2.** Managing agents, discussed below, can also be chosen to act as the Names' underwriting agents to perform the function of placing Names in syndicates, but ordinarily a member's agent is chosen.

assume. *See Syndicate 420 at Lloyd's London v. Early American Insurance Co. Ltd,* 796 F.2d 821, 824 (5th Cir.1986).

Through their syndicates, Names subscribe to a certain percentage of the risk on policies, in return for a certain percentage of the premium paid to the syndicate by the insured. Normally, syndicates do not insure 100% of a risk. Rather, a number of syndicates agree to subscribe, each assuming a specified portion of the total risk. A syndicate member is entitled to a specified (contracted-for) share of the profits from the syndicate's business and is responsible for that share of loss only.

Although Names have unlimited personal liability for their respective share of the risk, a Name has no responsibility whatsoever for the liability of his fellow syndicate members. Section 8(i) of the Lloyd's Act of 1982 states:

> An underwriting member shall be a party to a contract of insurance underwritten at Lloyd's only if it is underwritten with several liability, each underwriting member for his own part and not one for another and if the liability of each underwriting member is accepted solely for his own account.

In addition, when a Name becomes a member of a syndicate, the contract he or she signs specifies that

> [nothing in his or her agreement with the relevant member's agent or managing agent] shall constitute a partnership between the Name and the Agent or between the Name and any or all of the other members of the Contracted Syndicates.

Schedule 1, Clause 16.1, Lloyd's Byelaw No. 8 of 1988 Agency Agreements.

> Nothing in this Agreement shall constitute any partnership between ... the Name and any other person or persons whomsoever....

Schedule 1, Clause 20, to Lloyd's Byelaw No. 1 of 1985 Agency Agreements.

Syndicates exist for one year, at the end of which they are dissolved and reconstituted. However, although syndicates are identified by numbers (*e.g.,* Syndicate No. 670), the numbers are often reused from year to year and often, at their option, many of the same Names remain members. The Names elect each year which syndicates they wish to join. A syndicate closes its accounts for a given year by transferring its potential liabilities to the members of the syndicate in the following year of account, a practice called "reinsurance to close," and the same managing agents usually run the syndicates from year to year.

There are approximately 365 syndicates in the Lloyd's system. 300 of them, identified by numerical reference in the caption to the complaint, are named as defendants in this action. They are the syndicates to which the 91 plaintiff-investors belonged.

## II.

The Syndicate Defendants argue, and ordinarily it would be the case, that either English or New York law controls as to the legal status of the syndicates. It is syndicates' position that their legal status in England is controlling on the issue of whether they are amenable to suit here and that New York law, if it applies, supports their position. However, according to plaintiffs, federal law controls and that federal law is said to be found in the Securities Acts together with the provisions of Fed. R.Civ.P. 17(b). In brief, plaintiffs assert that Congress legislated that "persons" that are "issuers" are subject to the Securities Act of 1933 and the Securities and Exchange Act of 1934 and automatically have legal existence. Plaintiffs contend that Fed.R.Civ.P. 17(b) makes clear "the rule-maker's goal of removing any procedural obstacles to fulfillment of Congress's intent." (Letter to Court from Plaintiffs' Counsel (March 26, 1992)).

We conclude that English law applies, but whether the test be under English or New York or federal law, the syndicates do not have legal existence.

## III.

 It is undisputed that under the law of England, the syndicates do not constitute legal entities. Plaintiffs themselves

have submitted a barrister's affidavit that squarely concedes the proposition:

> As a matter of law, English courts would be bound to treat the syndicates as unincorporated groups of separate traders, without legal personalities, that could not be sued other than by proceeding against all their individual members or against a representative member or members.

Affidavit of Anthony Colman, ¶ 28. Plaintiffs concede that under English common law, the syndicates would not be amenable to suit under any claims plaintiffs might bring in the United Kingdom. All of the literature concerning Lloyd's defines syndicates as a group of Names on behalf of whom an underwriter accepts insurance business. Standard reference works are replete with comments such as the following: "a syndicate is not a legal entity;"[3] "all Names are ... sole traders;"[4] "the syndicate itself is not an insuring entity, simply an 'annual venture' between individual Names;"[5] and "Lloyd's structure [is] of a Society of Names trading as sole traders."[6] Furthermore, the informational packets provided to the prospective Names—and thus every plaintiff-investor here—, as well as the membership documents signed by each Name, specify that syndicates are not legal entities.[7]

If English law applies, therefore, the syndicates' motion must be granted.

\*　　　\*　　　\*

To become a Name, an individual must be nominated and seconded and have established certain minimum financial net worth tests. Under Lloyd's bylaws, the Name is required to travel to London to submit to an interview at Lloyd's. Upon acceptance into the Society of Lloyd's, the individual executes a number of documents, among which are the premium trust deed, a member's agent agreement, and a managing agent agreement. Each of the documents provides that it is to be governed by the law of England. Each by its terms provides for dispute resolution either in the courts or in arbitration, as the document may be, in England. There are presently approximately 26,000 names worldwide; 21,000 plus, or 80 percent, are English citizens. The syndicates argue that because the English Names vastly predominate in the group, because the documents which they execute specify the application of English law and the disposition of disputes in England, and because the documents were all executed in England, English law applies.

In addition, this outcome makes particular sense in this case, according to the syndicates, because it involves agreements with Names throughout the world. As the syndicates reasonably note, it would destroy uniformity of treatment and undermine commercial stability if the determination of the legal existence of the Lloyd's syndicates depended on the fortuitous fact of where a Name's lawyer's office was located, which Name sues, where he or she sues, or what cause of action he or she sues on.

In *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 698 (2d Cir.1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971), the court, quoting then District Judge Mansfield, held that the legal existence of a foreign corporate entity "must be determined by the laws of the country where it has been created and continues to exist." *Id.*[8] It is true that the

---

**3.** J. Cowen, *Lloyd's Regulatory Requirements* (Chartered Insurance Institute 1991) (glossary).

**4.** Stephen Lewis & Jan Woloniecki, "Lloyd's: The Market Structure," in *Lloyd's, the ILU and the London Insurance Market*, at 39 (PLI Comm.L. & Prac. No. 472 1988).

**5.** *Lloyd's: A Route Forward* (1992) (a task force report).

**6.** *Id.*

**7.** The membership brochures state:

A syndicate is not a legal entity. Each member of the syndicate is responsible only for the proportion of business written on his behalf. It is a matter of each for his own part and not one for another.

**8.** *Carl Zeiss* states:

the legal existence, status, identity, and domicile of a foreign corporate entity or juristic personality, such as the Foundation here, must be determined by the laws of the country where it has been created and continues to exist.

quoted statement in *Carl Zeiss* was dicta with regard to legal existence because the sole issue there was that of identity between successor entities. Nevertheless, the rule enunciated is still persuasive authority.

New York choice of law rules would reach the same result. In choice of law cases, New York courts apply the criterion of "interests analysis," under which "the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation," controls. *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 581 N.E.2d 1042, 575 N.Y.S.2d 796 (Ct.App.1991). Under this standard, because Lloyd's is based in London and approximately 80% of the Names are English citizens, English law governs.

### IV.

■ Although I conclude that English law governs, the application of substantive New York law would result in the same outcome.

This court has previously considered the question whether syndicates qualify under the New York statutory definition of "unincorporated associations," which is the only possible legal classification the syndicates could belong to, since they are neither corporations, partnerships nor individuals.[9] In *Bobe v. Lloyd's*, 27 F.2d 340, 345 (S.D.N.Y. 1927), *aff'd per curiam*, 27 F.2d 347 (2d Cir.1928), the court held that the syndicates do not constitute unincorporated associations within the meaning of Section 13 of the New York General Associations Law, the controlling provision. In *Bobe*, a Special Master considered the issue of the syndicates' legal existence under New York statutory law and held, in a report which

the court confirmed, that Lloyd's syndicates were not unincorporated associations under New York law, after noting that the Names' "liability was several, not joint, and that each underwriter was obligated only for the amount of his individual underwriting, irrespective of the obligation of any of the other underwriters." *Id.*

Plaintiffs argue that the first *Bobe* decision, 10 F.2d 730 (2d Cir.), *cert. denied*, 270 U.S. 663, 46 S.Ct. 472, 70 L.Ed. 778 (1926), not the *Bobe* decision cited by the syndicates, 27 F.2d 340, 345 (S.D.N.Y.1927), *aff'd per curiam*, 27 F.2d 347 (2d Cir.1928), is controlling as to the syndicate's legal existence. In the first decision, according to plaintiffs, the Second Circuit remanded for additional fact-finding on the issue of whether service of process was properly made on the treasurer or the president of the syndicates. The plaintiffs add that there would have been no need for remand as to service of process if the record before the Second Circuit had not been sufficient to establish that syndicates were unincorporated associations under Section 13. Plaintiffs' position is misguided for two reasons. *First*, the earlier *Bobe* decision did not rule that the syndicates were unincorporated associations but only that the allegations of the complaint properly alleged them to be unincorporated associations. *Second*, the later and final *Bobe* decision specifically held at the District Court level, after fact-finding, that the syndicates were not unincorporated associations, and this decision was affirmed without opinion by the Court of Appeals.

### V.

As indicated above, plaintiffs take the position that United States law controls. They argue that the Securities Acts togeth-

---

*Id.* (quoting the district court decision by Judge Mansfield, 293 F.Supp. 892, 898 (S.D.N.Y.1968)).

9. Plaintiffs more or less concede that the syndicates are not partnerships which would appear to be an obvious conclusion since syndicates lack the essential characteristic of a partnership—joint liability. However, in a footnote to their brief, they remark:

Although ostensibly Names are not jointly and severally liable for syndicates' debts, dis-

covery may show that the syndicates are also partnerships by estoppel under Section 27 of the New York Partnership Law, at least for purposes of their transactions in the United States.

No indication whatsoever has been provided as to what type of evidence plaintiffs expect to uncover through discovery that might establish a relationship of "partnerships by estoppel."

er with Fed.R.Civ.P. 17(b) establish the legal existence of the syndicates.

### A. Plaintiffs' contentions under securities laws

■ As we understand plaintiffs' argument, which in our eyes is particularly convoluted,[10] it is that the only question before the Court is whether the syndicates constitute "persons" under the federal securities laws. They argue that, as issuers of securities, the syndicates are by definition, that is, without more, suable under the United States securities laws. But this argument begs the very question which must be decided. In *Dean v. Barber*, 951 F.2d 1210 (11th Cir.1992), the Eleventh Circuit explicitly rejected a similar contention:

> The question here is not whether the Jefferson County Sheriff's Department is a 'person' for purposes of liability under *Monell* [*v. Department of Social Services*, 436 U.S. 658, 56 L.Ed.2d 611 (1978)] and section 1983, but whether the Department is a legal entity subject to suit.

951 F.2d at 1214.

The American legal system distinguishes between the concepts of causes of action, on the one hand, and persons who can be sued, on the other. The Securities Acts, supplemented by judicial decisions, do, of course, create various causes of action. But nowhere do they purport to confer legal existence. The Securities Acts provide only that "issuers" are persons who issue securities, and "persons" include "unincorporated associations"[11] or "organized group of persons,"[12] but these provisions do not solve the problem posed by this case because they give no definition of what constitutes an "unincorporated association" or "organized group of persons," and the cases which plaintiffs rely upon for such further definition do not deal with the Securities Acts or their terminology.

*United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 351, 42 S.Ct. 570, 66 L.Ed. 975 (1922), is a case upon which plaintiffs place substantial reliance. There, the Supreme Court held that unincorporated labor unions, such as the United Mine Workers of America, and its district and local branches—recognized as distinct entities by numerous acts of Congress, as well as by the laws and decisions of many states—were suable under the Sherman Act. However, the Sherman Act, in contrast to the Securities Acts, includes a precise definition of the extent to which an association or group might be held liable as a "person" under the act:

> § 7. "Person" defined
> The word "person", or "persons", wherever used in sections 1 to 7 of this title shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.

---

10. The following excerpt from the letter of plaintiffs' counsel to the Court, dated March 26, 1992, in response to the Syndicate Defendants' reply brief, sets forth plaintiffs' theory:

> What plaintiffs allege is that the syndicates' liability here derives from their status as issuers of securities under the federal securities laws. The syndicates' legal existence and amenability to suit here rest not on Rule 17(b), but on Congress's creation of that very class of entities—issuers of securities. Under plaintiffs' analysis, for purposes of this motion, the only question before the Court is whether the syndicates are issuers—that is whether they constitute "persons" under the federal securities laws and whether they "issue or offer to issue" securities. Whether the syndicates constitute "persons," in turn, depends on whether they are "unincorporated associations" (under the Securities Acts) or "organized groups of persons whether incor-

porated or not" (under the Securities and Exchange Act). Plaintiffs do not contend that Rule 17(b) gives the answer to that question. Rule 17(b) simply shows which substantive law—state, federal or foreign—does. Here, where plaintiffs allege federal securities law violations, Congress has answered that question in the securities laws by declaring that the syndicates may be sued for issuing securities in violation of the federal securities laws. Rule 17(b) merely clarifies the rule-makers' goal of removing an procedural obstacles to fulfillment of Congress's intent.

11. Section 2(2) of the Securities Act, 15 U.S.C. § 77b(2).

12. Section 3(a)(9) of the Securities and Exchange Act, 15 U.S.C. § 78c(a)(9) and section 3(a)(19), 15 U.S.C. § 78c(a)(19).

Sherman Act, 15 U.S.C. § 7. The securities laws provide no such guidance as to who can be sued under them. Plaintiffs themselves concede that neither the Securities Act of 1933 nor the Securities and Exchange Act of 1934 defines an "unincorporated association" and rely on federal judicial decisions to provide the definition of that term, but, as stated above, the cited decisions do not construe the Securities Acts.

Moreover, no provision of the Securities Acts indicates a legislative intent to confer legal existence on any entity that was not suable prior to enactment of the Securities Acts, and plaintiffs point us to no authority, either in the legislative history of the Acts or judicial decisions, which supports their argument.

Finally, whatever authority there is as to whether the syndicates are "issuers" altogether undermines the plaintiffs' position and specifically the position of the named plaintiff in this case. In a letter to Congressman Don J. Pease of the United States House of Representatives from Mary E.T. Beach, Senior Associate Director of the SEC, dated August 5, 1991, in response to a letter from him forwarding questions raised by his constituent, John S. Roby (the lead plaintiff here), Ms. Beach states:

> The staff of the Commission's Division of Corporation Finance has had discussions on two occasions with Lloyd's concerning the applicability of the Securities Act of 1933 ... and the Securities and Exchange Act of 1934 ... to the solicitation of U.S. Citizens to participate in Lloyd's. It is the Division's position that the solicitation of participations involves the sale of a security, with the issuer of that security being the particular Members' Agent [not the syndicate] involved.

Thus such authority as there is refutes the argument that, in plaintiffs' words, Congress "deemed" syndicates to be among the class of possible defendants under the federal securities laws.

B. Plaintiffs' contentions under Rule 17(b)

█ Rule 17(b) provides in pertinent part:

*Capacity to Sue or be Sued.* The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, *except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States,....* (emphasis added).

Plaintiffs argue that because they "have sued the syndicates only under the federal securities and RICO laws, and hence seek to enforce only federal substantive rights, the syndicates' capacity to be sued is [ ] governed by Fed.R.Civ.P. 17(b)." As the plaintiffs' counsel states in his letter to the court of April 2, 1992:

> in promulgating Fed.R.Civ.P 17(b) in 1937, the Supreme Court consciously acted to federalize the definition of an 'unincorporated association' where, as here, Congress through specific legislation intended to render an unincorporated association subject to suit, notwithstanding any contrary bar or absence of authority under otherwise applicable law, whether state or foreign.

The Syndicate Defendants respond that plaintiffs' theory is analytically flawed. They contend that, as a rule of civil procedure, Rule 17(b) confers no substantive rights and is not triggered until a Court has first made the threshold determination that the party in question is a legal entity. They maintain that Rule 17(b) does not purport to, and cannot constitutionally, establish the legal existence of a particular entity. Creation of a legal entity, other than an individual, according to the syndicates, can be accomplished only by legislation, not by a rule of procedure.

1. *Legal existence and capacity to sue and be sued are distinct concepts on their face*

Capacity to be sued and legal existence are separate and distinct concepts. Both capacity to be sued and legal existence are prerequisites to the suability of an entity, but Rule 17(b) speaks only to capacity to sue or be sued.

That legal existence and capacity to be sued are distinct concepts is made clear by the language of Rule 9(a) of the Fed. R.Civ.P. which specifically distinguishes between the "legal existence of any party," on the one hand, and "the capacity of any party to sue or be sued," on the other.[13] Judicial decisions—even those cited by plaintiffs—demonstrate that Rule 17(b) addresses only the question of capacity to sue or be sued. *See, e.g., Klinghoffer v. S.N.C. Achille Lauro,* 739 F.Supp. 854, 858, 865–66 (S.D.N.Y.1990) (treating issue of legal existence and capacity to sue separately), *vacated on other grounds,* 937 F.2d 44 (2d Cir.1991) (on other grounds); *Associated Students v. Kleindienst,* 60 F.R.D. 65, 67 (C.D.Cal.1973) (same).[14]

Put another way, the reach of Rule 17(b) is limited to providing that partnerships or other unincorporated associations which have no capacity under state law to sue or be sued may nevertheless sue or be sued in their common name in federal court for the purpose of enforcing for or against them a substantive right existing under the Constitution or laws of the United States, but Rule 17(b) does not confer legal existence or create new types of legal entities.

Plaintiffs contend that formal organization or compliance with an organizational statute is not required to permit an unincorporated association to be sued on a federal question. But "unincorporated association" is a term of art—every group that is not a corporation or partnership is not automatically an unincorporated association. "It is well settled that it must appear that an association, if it is not a corporation, has received by appropriate legislation a legal status before it, or its members, may be sued in the name of the group." *United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 351, 42 S.Ct. 570, 66 L.Ed. 975 (1922). Plaintiffs have failed to establish that the syndicates are unincorporated associations under any possibly applicable law—English, federal or New York State—and indeed English and New York law are directly to the contrary.

2. *Legal existence is a substantive proposition that cannot be controlled by a rule of procedure*

A further proposition which undermines the plaintiffs' contention that Rule 17(b) confers legal existence on the syndicates is that to do so would violate the Rules Enabling Act, 28 U.S.C. § 2072(b), which provides that the Federal Rules of Civil Procedure may not "abridge, enlarge or modify any substantive right." As the United States Supreme Court has construed the Rules Enabling Act:

> An authority conferred upon a court to make rules of procedure for the exercise of its jurisdiction is not an authority to

---

**13.** Rule 9. *Pleading Special Matters*

(1) *Capacity.* It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party....

**14.** Plaintiffs refer to *United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 351, 42 S.Ct. 570, 66 L.Ed. 975 (1922), *supra,* and an article written by Dean (later Judge) Clark and Professor Moore, "A New Federal Procedure—II. Pleading and Practice," 44 Yale L.J. 1291, 1312–17 (1935), interpreting the Federal Rules of Civil Procedure prior to their adoption. In these works, there is at times a lack of clarity concerning a distinction between the concepts of "legal existence" and "capacity to sue or be sued" which plaintiffs contend proves their point that Rule 17(b) performs the function of providing for both concepts (or that the two concepts are identical). But regardless of what Clark and Moore in their article may or may not say, there is no question that courts have consistently recognized a distinction between the concepts of legal existence and capacity to sue or be sued in the interpretation of Rule 17(b). *See, e.g., Klinghoffer v. S.N.C. Achille Lauro,* 739 F.Supp. 854 (S.D.N.Y.1990), *vacated,* 937 F.2d 44 (2d Cir.1991) (on other grounds); *Associated Students v. Kleindienst,* 60 F.R.D. 65, 67 (C.D.Cal.1973).

enlarge that jurisdiction; and the Act ... authorizing this Court to prescribe rules of procedure in civil actions gave it no authority to modify, abridge or enlarge the substantive rights of litigants or to enlarge or diminish the jurisdiction of federal courts.

*United States v. Sherwood*, 312 U.S. 584, 589–590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). The syndicates submit that if Rule 17(b) were construed to create a legal entity, the court would be performing a legislative rather than a judicial function. That argument has merit.

The plaintiffs acknowledge that if the issue of legal existence is a substantive proposition, Rule 17(b) could not control it. The plaintiffs, however, take the position, without citing any authority, that the question of legal existence is procedural, not substantive. While the authority on the point is slim—perhaps because the answer to the question is obvious—, it favors the syndicates' position. For example, in his discussion of the subject in *Busby v. Electric Utilities Employees Union*, 323 U.S. 72, 76–77, 65 S.Ct. 142, 145, 89 L.Ed. 78 (1944) (concurring), Justice Frankfurter distinguishes between "suability" and "status" and characterizes "suability" as a "procedural matter" and "determination of status" as a "substantive issue." *Id.*

C. Plaintiffs' miscellaneous contentions

In a number of cases in the United States, syndicates have been sued and been treated as legal entities, and some syndicates have themselves sued or asserted counterclaims. Plaintiffs argue that such actions and determinations contradict the syndicates' claim of non-existence. However, in none of the cases referred to was the question of the syndicates' legal existence ever raised, nor is there any assertion that any syndicate which is a defendant here was a party to the earlier litigation. The issue of legal existence arose, if at all, only indirectly, in the context of determining what kind of entity a syndicate was for purposes of determining diversity jurisdiction. *See International Insurance Co. v. Certain Underwriters at Lloyd's London*, 1991 WL 349914, 1991 U.S.Dist. LEXIS 12,-937 (N.D.Ill.1991) and *Graham v. Lloyd's of London*, 371 S.E.2d 801, 296 S.C. 249 (S.C.App.1988).

■ The plaintiffs also suggest that the syndicates must have legal existence because they own property interests in the $9 billion Lloyd's American Trust Fund ("LATF") held by Citibank, N.A., in New York. Even assuming for the moment that the syndicates have an ownership in the funds, plaintiffs have not shown that such ownership would alone confer legal existence upon the syndicates under English, New York or federal law.

Moreover, there is sufficient undisputed material before the Court in the form of affidavits submitted by both sides to support a conclusion that at best the nature of the syndicates' interest is not that of an owner or beneficiary but that of a nominee or fund manager. The record is incomplete on this point, but at best what has been presented even by the plaintiffs leaves considerable doubt whether the syndicates own property interests in the LATF. For example, in a post-argument motion filed by the plaintiffs under Fed.R.Civ.P. 56(f) for further discovery on the subject, a supporting barrister's affidavit states: "I would emphasize that there is no money in the LATF that is not Names' money." The direct beneficiaries of the fund appear to be the policy holders, to the extent of their justified insurance claims; the Names having a reversionary interest in any funds left in the LATF after payout of claims.

\* \* \*

In sum: English law controls, and under English law the syndicates have no legal existence. The result is the same under New York or federal law. Accordingly, the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is granted. It is unnecessary to determine whether the complaint is defective also under Fed.R.Civ.P. 12(b)(1).

The complaint is dismissed as to the Syndicate Defendants.

It is so ordered.